2003 WY 102

**David and Kimberly BIRT, Appellants (Plaintiffs),**

v.

**WELLS FARGO HOME MORTGAGE, INC., f/k/a Norwest Mortgage, Inc., Appellee (Defendant).**

**No. 02–124.**

Supreme Court of Wyoming.

Aug. 27, 2003.

**644**

Representing Appellants: Curtis B. Buch-hammer and Loretta R. Green of Buchham-mer & Kehl, P.C., Cheyenne, Wyoming.

Representing Appellee: Robert T. McCue and Amanda Hunkins of Speight, McCue & Associates, P.C., Cheyenne, Wyoming.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

VOIGT, Justice.

[¶ 1]   David and Kimberly Birt (the Birts) appeal from the district court's Order Denying Defendant's Motion to Dismiss and Granting Defendant's Motion for Summary Judgment.   Because there are no genuine issues of material fact and Wells Fargo Home Mortgage, Inc. (Wells Fargo) is entitled to judgment as a matter of law, we affirm.

## ISSUES

[¶ 2]   The parties' separate renditions of the numerous issues raised in this appeal are lengthy and somewhat argumentative.   Consequently, we will restate the issues as follows, all of which arise in summary judgment context:

1.   Did the parties enter into an express contract?

2.   Did the parties enter into an implied contract?

3.   Are the contract claims barred by the statute of frauds?

4.   Did Wells Fargo breach the covenant of good faith and fair dealing?

5.   Does the doctrine of promissory estoppel apply?

6.   Does the doctrine of equitable estoppel apply?

7.   Did Wells Fargo intentionally interfere with a contract between the Birts and their construction company?

8.   Did Wells Fargo breach a duty to the Birts for the purposes of a negligence claim?

9.   Did Wells Fargo breach a fiduciary duty owed to the Birts?

10.   Was Wells Fargo guilty of negligent misrepresentation?

## FACTS[1]

[¶ 3]   The Birts intended to construct a house on property they owned in Laramie County.   In April 2000, the Birts met with Richard Gibbs (Gibbs), a Wells Fargo loan officer.   After reviewing the Birts' financial documents, Gibbs advised them that they would be eligible for a loan of $180,000.00.   Gibbs did not disclose to the Birts that, based on their credit report, sub-prime financing at a higher interest rate would be necessary.   The Birts had not built a home before, and they relied on Gibbs for guidance in completing the loan process.   Gibbs advised the Birts to contact a building contractor, to develop design plans, and to keep him updated.   The Birts updated Gibbs frequently, and Gibbs continued to assure the Birts that a loan would be forthcoming.

[¶ 4]   In July 2000, the Birts advised Gibbs that Mr. Birt was no longer self-employed, but had obtained full-time employment with guaranteed overtime.   After reviewing additional financial information supplied by the Birts, Gibbs advised them that the new employment put them in a better position, and stated that they might be eligible for an even larger amount.   Gibbs advised the Birts to go forward with their plans because obtaining a loan would not be a problem.   An architect completed design plans, and in August 2000, the Birts gave the plans to their proposed building contractor, Carter Brothers, to initiate the house's construction.   Carter Brothers supplied the Birts with an estimated construction cost of $234,744.40.   In mid-August 2000, Carter Brothers arranged for an appraisal of the house plans.

[¶ 5]   On September 4, 2000, Gibbs advised the Birts to sign a construction contract with Carter Brothers, even though he knew, from a second credit report pulled in early August, that the Birts' credit rating had slipped and that they would not be able to borrow as much as previously anticipated.   That afternoon, the Birts signed the construction contract for the earlier estimated amount.   On September 12, 2000, the Birts received a letter welcoming them to Wells Fargo Mortgage Resources.   Accompanying the letter were various loan disclosure documents required by the Federal Truth in Lending Act, which provided estimates of the loan amount, interest rate, and number of

---

1.   Pursuant to our standard of review of summary judgments, we present the facts from the vantage point most favorable to the Birts, awarding them all favorable inferences that may be drawn from those facts.   *S & G Investors, LLC v. Blackley,* 994 P.2d 941, 943 (Wyo.2000).

payments.[2] The letter concluded by stating, "We look forward to serving you."

[¶ 6] During August and September 2000, representatives of Carter Brothers contacted Wells Fargo and inquired when the loan commitment letter would be completed so that construction could begin. Carter Brothers also hired a surveyor to survey the land. On October 2, 2000, Carter Brothers contacted the Birts and told them that they had not yet received the loan commitment letter. A few days later, Mrs. Birt contacted Gibbs' supervisor to inquire as to the status of the loan. The supervisor reviewed the file, and later that day informed the Birts that the loan had been denied. The Birts then terminated the construction contract.

## STANDARD OF REVIEW

■■■ [¶ 7] Summary judgment motions are governed by W.R.C.P. 56(c):

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

[¶ 8] Our standard for the appellate review of a summary judgment was recently reiterated in *Rino v. Mead*, 2002 WY 144, ¶ 12, 55 P.3d 13, 17–18 (Wyo.2002) (*quoting Hasvold v. Park County School Dist. No. 6*, 2002 WY 65, ¶ 11, 45 P.3d 635, 637–38 (Wyo.2002)):

"Summary judgment is proper only when there are no genuine issues of material fact and the prevailing party is entitled to judgment as a matter of law.... We review a summary judgment in the same light as the district court, using the same materials and following the same standards. 'We examine the record from the vantage point most favorable to the party opposing the motion, and we give that party the benefit of all favorable inferences which may fairly be drawn from the rec-

ord.' ... Summary judgment serves the purpose of eliminating formal trials where only questions of law are involved.... We review a grant of summary judgment by deciding a question of law de novo and afford no deference to the district court's ruling on that question....

... A material fact is any fact that, if proved, would have the effect of establishing or refuting an essential element of a claim or defense asserted by a party...."

## DISCUSSION

[¶ 9] The Birts' complaint against Wells Fargo alleged ten causes of action: breach of an express contract, breach of an implied contract, breach of the implied covenant of good faith and fair dealing, breach of an agreement to lend money, equitable estoppel, promissory estoppel, intentional interference with a contractual relationship, negligence, negligent misrepresentation, and breach of a fiduciary duty. Wells Fargo obtained summary judgment on all counts. We will separately discuss each cause of action, as well as Wells Fargo's statute of frauds defense. Many of the above-related facts are significant to the discussion of more than one issue. We will not repeat all the facts for each issue, but each issue will be considered in the context of all the facts.

### EXPRESS CONTRACT

■■■ [¶ 10] The basic elements of a contract are offer, acceptance, and consideration. *McLean v. Hyland Enterprises, Inc.*, 2001 WY 111, ¶ 42, 34 P.3d 1262, 1272 (Wyo. 2001). In order for a contract to exist, there must be mutual assent to the same terms. *Roussalis v. Wyoming Medical Center, Inc.*, 4 P.3d 209, 231 (Wyo.2000). Whether a contract exists, its terms and conditions and the intent of the parties generally are questions of fact to be resolved by the fact-finder. *Ewing v. Hladky Const., Inc.*, 2002 WY 95, ¶ 11, 48 P.3d 1086, 1088 (Wyo.2002) (*quoting Roussalis*, 4 P.3d at 250). An express con-

---

2. Congress enacted the Truth in Lending Act to ensure meaningful disclosure. 15 U.S.C. § 1601(a). The Act was meant to "aid unsophisticated consumers and to prevent creditors from misleading consumers as to the actual cost of financing." *Morris v. Lomas and Nettleton Co.*, 708 F.Supp. 1198, 1203 (D.Kan.1989). When mandated disclosures are not made, strict liability applies in favor of the consumer. 15 U.S.C. § 1640(a). *Morris*, 708 F.Supp. at 1203.

tract is one in which the terms are declared by the parties either in writing or orally at the time the contract is formed. *Boone v. Frontier Refining, Inc.*, 987 P.2d 681, 685 (Wyo.1999); *Wilder v. Cody Country Chamber of Commerce*, 868 P.2d 211, 216 (Wyo. 1994). An express oral contract may be interpreted as a matter of law if the terms are shown without conflict in the evidence. *Anderson v. South Lincoln Special Cemetery Dist. ex rel. Bd. of Trustees of South Lincoln Special Cemetery Dist.*, 972 P.2d 136, 139 (Wyo.1999).

[¶ 11] One specific question in determining the parties' intent is whether their contract was meant to be formed only upon the signing of written documents or was meant to be formed upon an oral understanding.

" 'An agreement to make a written contract where the terms are mutually understood and agreed on in all respects is as binding as the written contract would be if it had been executed.' *Robert W. Anderson House[w]recking and Excavating, Inc. v. Board of Trustees, School District No. 25, Fremont County, Wyoming*, 681 P.2d 1326, 1331 (1984).

" 'In general, the principle is well settled that where the parties to a contract intend that it shall be closed and consummated prior to the formal signing of a written draft, the terms having been mutually understood and agreed upon, the parties will be bound by the contract actually made, although it be not reduced to writing; but, on the other hand, if the parties do not intend to close the contract until it shall be fully expressed in a written instrument properly attested, then there will be no complete contract until the agreement shall be put into writing and signed.' *Summers v. Mutual Life Ins. Co.*, 12 Wyo. 369, 75 P. 937, 943 (1904)."

*Frost Const. Co. v. Lobo, Inc.*, 951 P.2d 390, 394 (Wyo.1998) (*quoting Wyoming Sawmills, Inc. v. Morris*, 756 P.2d 774, 776 (Wyo.1988)).

[¶ 12] The Birts contend that, from the beginning, it was "understood" that they were seeking a mortgage loan from Wells

Fargo for an amount between $180,000 and $185,000, with terms "within industry standards," and with the newly constructed home to serve as collateral. It is their position that the loan agreement was consummated when Wells Fargo sent them the Federal Truth in Lending disclosures:

> The disclosure statements provided to the Birts dated September 12, 2000, included the exact amount of the loan, the dates for repayment, the collateral offered, the parties involved, and an estimated interest rate.... Upon receiving these documents, Mrs. Birt contacted Gibbs on ... she and her husband's behalf and expressed their willingness to sign the documents.... Gibbs' instruction to wait until closing was all that prevented the Birts from signing the documents contained in the disclosure packet dated September 12, 2000.

[¶ 13] We cannot agree with the Birts' assessment of this situation. If anything, Gibbs' instruction not to sign the disclosure documents but to wait until closing evinces Wells Fargo's intent that those documents were not a contract. Furthermore, it would certainly create havoc in the consumer lending industry were courts to declare the existence of a contract whenever a lender fulfilled its federal obligation of complete disclosure. Indeed, if an express contract was formed in such instance, the lender also could enforce it, leaving the borrower with no final opportunity to accept or reject the terms. That, of course, would destroy the purpose of disclosure. Furthermore, there is simply nothing in the record that suggests that the relationship between the Birts and Wells Fargo ever advanced beyond the loan application stage. Gibbs' assertions on behalf of Wells Fargo simply did not evidence an intention that an agreement had been finalized. At most, Gibbs' statements to the Birts can be characterized as assurances that the loan would be approved.

[¶ 14] There are no genuine issues of material fact in regard to the Birts' express contract cause of action and Wells Fargo is entitled to judgment. The district court's

ruling on this issue is affirmed.[3]

IMPLIED CONTRACT

[¶ 15] Although no express contract may have been formed, negotiating parties may reach an "implied-in-fact" contract. An implied-in-fact contract is distinguishable from a contract "implied in law." The former may be found to exist as a matter of fact and is dependent upon the parties' intent. *Shaw v. Smith*, 964 P.2d 428, 435–36 (Wyo. 1998). The latter is imposed as a matter of law, as an equitable remedy. *Amoco Production Co. v. EM Nominee Partnership Co.*, 2 P.3d 534, 541 (Wyo.2000); *Clark v. Gale*, 966 P.2d 431, 438 (Wyo.1998). For an implied-in-fact contract to have been created by the parties' conduct, " ' "the conduct from which that inference is drawn must be sufficient to support the conclusion that the parties expressed a mutual manifestation of an intent to enter into an agreement." ' " *Shaw*, 964 P.2d at 435–36 (*quoting Lavoie v. Safecare Health Service, Inc.*, 840 P.2d 239, 248 (Wyo.1992)).

[¶ 16] In determining whether an implied contract was formed, we look not to the subjective intent of the parties, but to " 'the outward manifestations of a party's assent sufficient to create reasonable reliance by the other party.' " *Givens v. Fowler*, 984 P.2d 1092, 1095 (Wyo.1999) (*quoting McDonald v. Mobil Coal Producing, Inc.*, 820 P.2d 986, 990 (Wyo.1991)). The question is "whether a reasonable man in the position of the offeree would have believed that the other party intended to make an offer." *Boone*, 987 P.2d at 687. In 1991, we adopted Restatement (Second) of Contracts § 19 (1979) for guidance in determining whether an implied-in-fact contract exists:

"(1) The manifestation of assent may be made wholly or partly by written or spoken words or by other acts or by failure to act.

(2) The conduct of a party is not effective as a manifestation of his assent unless he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents.

(3) The conduct of a party may manifest assent even though he does not in fact assent. In such cases a resulting contract may be voidable because of fraud, duress, mistake, or other invalidating cause."

*McDonald*, 820 P.2d at 990. In essence, an implied-in-fact contract may arise where "parties act in a manner conveying mutual agreement and an intent to promise...." *Worley v. Wyoming Bottling Co., Inc.*, 1 P.3d 615, 620 (Wyo.2000). Interpretation of an unambiguous implied-in-fact contract is a question of law. *Garcia v. UniWyo Federal Credit Union*, 920 P.2d 642, 645 (Wyo.1996).

[¶ 17] In support of their claim that an implied-in-fact contract existed in this case, the Birts rely on their numerous contacts with Gibbs from April through September 2000, Gibbs' assurances that he was an expert in loan processing, their own financial naiveté, and Gibbs' repeated assurances that the loan would be approved. As with their express contract claim, they also emphasize their receipt from Wells Fargo of the disclosure documents:

Considering the constant assurances of Gibbs, the Birts' lack of sophistication with the process, and the receipt of the documents that appeared to be mortgage papers more than five months into the process, it was not unreasonable for the Birts to rely on the terms and conditions of Gibbs' statements and the disclosure documents received. The Birts mirrored their assent to Gibbs' statements by incurring the services of an architect, entering into a construction contract, and obtaining both an appraisal and survey to move forward with the construction of their home. It can be clearly inferred by the conduct of

---

3. In their complaint, the Birts set forth breach of contract and breach of agreement to lend money as separate causes of action. In their appellate brief, however, they discussed express contract and agreement to lend money as "and/or" alternatives in one argument. While an agreement to lend money may be enforceable in Wyoming, we will not deal independently with that issue because we have concluded that no agreement was reached. *See Doud v. First Interstate Bank of Gillette*, 769 P.2d 927, 929 (Wyo.1989) and John M. Burman, *Lender Liability in Wyoming*, XXVI Land & Water L.Rev. 707, 722 (1991).

the Gibbs and the Birts that there was a mutual agreement for the provisions of the mortgage and a manifested intent to promise based upon Gibbs['] statements to both the Birts and the Carter Bros.

[¶ 18] In response to this argument, Wells Fargo contends that the discussions between Gibbs and the Birts never advanced beyond the pre-qualification and application phases of the financing process, and that the Birts simply cannot identify a point in time where Wells Fargo gave approval for a mortgage loan. Further, Wells Fargo notes that the Birts' subjective beliefs did not create a contract where Wells Fargo had not manifested an intent that a contract be formed.

[¶ 19] We conclude that summary judgment in favor of Wells Fargo was appropriate on this issue. There are no genuine issues of material fact from which a factfinder could conclude that an implied-in-fact contract arose. Even Mrs. Birt acknowledged in her deposition testimony that at the time she and her husband deeded their land over to Carter Brothers for construction purposes, they knew that Wells Fargo had not produced a commitment letter. That, in effect, is an admission that the Birts knew that no loan agreement had yet been reached. Mrs. Birt also testified that she knew the figures in the disclosure documents were "just numbers plugged in," and that the "actual numbers" would be provided at closing. Furthermore, Mrs. Birt knew that the loan was not meant to be consummated until the signing of final papers at closing:

> Q. Did he say why they were just numbers plugged in and not the actual numbers?
>
> A. No.
>
> Q. Okay. Did you ask him?
>
> A. No, I didn't. I just told him—I did ask him if we should sign it and he says, no, don't sign it *because we'll have new papers drawn up at the time of closing, that this is just an example of what the loan would look like.*

(Emphasis added.)

[¶ 20] Clearly, the Birts were aware that Wells Fargo did not intend to create a contract, through Gibbs' conduct or otherwise, in advance of the execution of final loan documents at closing. While the Birts certainly appear fully to have expected that closing to occur, it cannot be said that any identified conduct of Gibbs or Wells Fargo manifested an intent to enter into an oral contract or for the Birts to sign the disclosure documents as a contract. We affirm the district court's ruling on this issue.

### GOOD FAITH AND FAIR DEALING

[¶ 21] Our conclusion that neither an express contract nor an implied-in-fact contract existed in this case leads inexorably to the further conclusion that Wells Fargo was entitled to summary judgment on the issue of its alleged breach of the implied covenant of good faith and fair dealing. Without a contract, there is no basis for imposition of the implied covenant, whether in contract or in tort, because either cause of action arises out of the contractual relationship. *Scherer Const., LLC v. Hedquist Const., Inc.,* 2001 WY 23, ¶¶ 20, 23 n. 3, 18 P.3d 645, 654–55 n. 3 (Wyo.2001); *Wilder,* 868 P.2d at 221; 86 C.J.S. *Torts* §§ 4 and 5 (1997); 74 Am.Jur.2d *Torts* § 19 (2001). The duty of good faith and fair dealing does not come into play until the parties have reached an agreement and does not bind them during their earlier negotiations. *Husman, Inc. v. Triton Coal Co.,* 809 P.2d 796, 801–02 (Wyo. 1991).

### STATUTE OF FRAUDS

[¶ 22] Wyo. Stat. Ann. § 1–23–105 (LexisNexis 2003) provides, in pertinent part:

> (a) In the following cases every agreement shall be void unless such agreement, or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith:
>
> > (i) Every agreement that by its terms is not to be performed within one (1) year from the making thereof[.]

[¶ 23] Where loan payments extend beyond a year, the underlying contract, to be found enforceable, must be in writing and signed by the party against whom enforcement is sought. *Giacchino v. Estate of Stalkup,* 908 P.2d 983, 986 (Wyo.1995). It is uncontested that the proposed loan in the instant case

was to be for thirty years. That key fact is the gist of Wells Fargo's statute of frauds argument—because the loan agreement could not be performed within one year, any contract had to be in writing. In their Reply Brief, the Birts propound two counter-arguments. First, they assert that Wells Fargo is precluded from raising the statute of frauds on appeal because it did not appeal from the district court's order denying the motion to dismiss and granting the motion for summary judgment. Second, the Birts contend that, even if the statute of frauds applies to their contract claims, it does not apply to their equitable claims.

██ [¶ 24] In the district court, Wells Fargo raised the statute of frauds as part of its summary judgment argument, not as a basis for its motion to dismiss. Consequently, the district court's denial of the motion to dismiss did not implicate the statute of frauds.[4] In granting summary judgment to Wells Fargo, the district court made no mention of the statute of frauds. Instead, the district court ruled that the uncontested facts simply could not sustain any of the causes of action. Under these circumstances, it would not seem appropriate to expect that Wells Fargo would have appealed from a decision in its favor, and we are inclined to consider the statute of frauds defense as having been properly raised on appeal.

[¶ 25] Like the district court, we have concluded that neither an express contract nor an implied-in-fact contract existed between Wells Fargo and the Birts. Consequently, the statute of frauds issue is moot to that extent. Furthermore, inasmuch as Wells Fargo did not raise the defense of the statute of frauds, either here or below, in regard to the Birts' equitable claims, we need not consider that issue.[5]

---

4. The motion to dismiss raised jurisdictional issues.

5. Long ago, this Court held that "[w]ith some exceptions, equity as well as the law is bound by the statute of frauds." *Crosby v. Strahan's Estate,* 78 Wyo. 302, 324 P.2d 492, 496 (1958). In more recent years, we have further held that these exceptions should be restricted, rather than expanded, even when hardship may result. *Fowler v. Fowler,* 933 P.2d 502, 504 (Wyo.1997);

## PROMISSORY ESTOPPEL

██ [¶ 26] "Promissory estoppel is a doctrine incorporated in the law of contracts." *B & W Glass, Inc. v. Weather Shield Mfg., Inc.,* 829 P.2d 809, 813 (Wyo. 1992). Its general theory is that, " '[i]f an unambiguous promise is made in circumstances calculated to induce reliance, and it does so, the promisee if hurt as a result can recover damages.' " *Id. (quoting Goldstick v. ICM Realty,* 788 F.2d 456, 462 (7th Cir. 1986)). Promissory estoppel applies, however, only if no contract exists. *Sowerwine v. Keith,* 997 P.2d 1018, 1021 (Wyo.2000). The elements of promissory estoppel are:

"(1) the existence of a clear and definite promise which the promisor should reasonably expect to induce action by the promisee; (2) proof that the promisee acted to its detriment in reasonable reliance on the promise; and (3) a finding that injustice can be avoided only if the court enforces the promise."

*City of Powell v. Busboom,* 2002 WY 58, ¶ 8, 44 P.3d 63, 66 (Wyo.2002) (*quoting Roussalis,* 4 P.3d at 253). The party asserting promissory estoppel has the burden of establishing each element under a burden of strict proof. *Busboom,* 2002 WY 58, ¶ 8, 44 P.3d at 66. The first two elements are questions of fact for the fact-finder; the third element is a question of law for the court. *Id.; Loya v. Wyoming Partners of Jackson Hole, Inc.,* 2001 WY 124, ¶ 22, 35 P.3d 1246, 1254 (Wyo. 2001).

██ [¶ 27] For purposes of the doctrine of promissory estoppel, a promise is a "manifestation of intention to act or to refrain from acting in a specified way made so as to justify a promisee in understanding that a commitment has been made." *Busboom,* 2002 WY 58, ¶ 10, 44 P.3d at 66. A

---

*Empfield v. Kimbrough,* 900 P.2d 1153, 1155 (Wyo.1995); *Turner v. Floyd C. Reno & Sons, Inc.,* 696 P.2d 76, 79 (Wyo.1985). At the same time, however, we have held that promissory estoppel may avoid application of the statute of frauds. *Davis v. Davis,* 855 P.2d 342, 348 (Wyo. 1993); *Ames v. Sundance State Bank,* 850 P.2d 607, 610 (Wyo.1993); *B & W Glass, Inc. v. Weather Shield Mfg., Inc.,* 829 P.2d 809, 815 (Wyo.1992).

promise may arise through words or conduct, but conduct must be specifically demonstrative of an intention respecting future conduct before it can serve as the foundation for a clear and definite promise. *Id.,* 2002 WY 58, ¶ 10, 44 P.3d at 66–67.

[¶ 28] In addition to establishing the existence of a clear and definite promise, a plaintiff must also show " 'action or forbearance of a definite and substantial character' " to satisfy the second element of the doctrine. *Loya,* 2001 WY 124, ¶ 22, 35 P.3d at 1254 (*quoting Worley,* 1 P.3d at 624). Further, such action or forbearance must be the result of "reasonable reliance." *Davis v. Davis,* 855 P.2d 342, 348 (Wyo.1993). We have described reasonable reliance as follows:

> In *Provence [v. Hilltop National Bank,* 780 P.2d 990 (Wyo.1989) ], we explained that detriment in reasonable reliance is closely tied to the existence of a clear and definite agreement. A reasonable person does not rely to his or her detriment on an oral agreement unless it is sufficiently clear and definite as to induce him or her to act. *Provence.* "There can be no estoppel as a matter of law when the asserted reliance is not justifiable or reasonable under the circumstances of the case considered as a whole." *Roth [v. First Security Bank of Rock Springs, Wyoming],* 684 P.2d [93,] 97 [ (Wyo.1984) ] (citing *Matter of Simineo v. Kelling,* 199 Colo. 225, 607 P.2d 1289 (1980)). The representation that induces the reliance also must be the immediate or proximate cause of the act in reliance. *Roth.* The knowledge and sophistication of the relying party is to be considered in determining reasonableness (*Roth* ) and consistent with the Restatement (Second) of Contracts § 90, we also consider the reasonable foreseeability by the promisor that the promisee would rely on the statement or representation. [*Inter–Mountain Threading, Inc. v.] Baker Hughes [Tubular Services, Inc.,* 812 P.2d 555 (Wyo.1991)].

*Davis,* 855 P.2d at 348.

[¶ 29] The third element of promissory estoppel is a finding by the court that "the equities" support enforcement of the promise. This means that promissory estoppel is only invoked when it is necessary to avoid injustice, which is a policy determination that embraces an element of discretion. *Id.* at 349.

[¶ 30] "The standard of appellate review of matters in equity varies widely by jurisdiction." 27A Am.Jur.2d *Equity* § 262 at 746 (1996). Some courts hold that an appeal in an equitable matter opens the entire case for review as if no decision had been rendered below, whereas some courts limit review to ,a determination of whether substantial evidence supports the judgment, the judgment is against the great weight of the evidence, or there were errors of law. 5 Am.Jur.2d *Appellate Review* § 696 at 366–67(1995). We have previously held that, in a bench trial situation, our review is for an abuse of discretion, the questions being whether the trial court could reasonably conclude as it did and whether any part of its ruling was arbitrary or capricious. *Thompson v. Board of County Com'rs of the County of Sublette,* 2001 WY 108, ¶ 7, 34 P.3d 278, 280–81 (Wyo.2001). The instant case, however, does not involve a bench trial, but comes to this Court by way of summary judgment. Recently, we noted that "we have approved the use of summary judgment in actions which were historically equitable in nature," and we quoted from an Oklahoma case in describing appellate review in such cases:

> "The underlying action, being one to foreclose a mortgage lien, is equitable in nature. Ordinarily, in reviewing a case of equitable cognizance a judgment will be sustained on appeal unless it is found to be against the clear weight of the evidence or is contrary to law or established principles of equity. But because this comes to us from an order granting summary judgment the appellate standard of review is *de novo.*"

*McNeill Family Trust v. Centura Bank,* 2003 WY 2, ¶¶ 9–10, 60 P.3d 1277, 1282 (Wyo. 2003) (*quoting Abboud v. Abboud,* 2000 Ok Civ App 116, ¶ 4, 14 P.3d 569, ¶ 4 (Okla.Civ.

App.2000)).[6] We apply our traditional standards for review of a summary judgment. *See Hulse v. First Interstate Bank of Commerce Gillette*, 994 P.2d 957, 958–59 (Wyo.2000).

[¶ 31] The district court in the instant case did not grant summary judgment to Wells Fargo on the promissory estoppel claim because "the equities" demanded it. Rather, the district court found neither a clear and definite promise nor reasonable detrimental reliance. In that regard, we find the undisputed material facts of this case indistinguishable from those of *Hulse*. Simply stated, statements made during the loan application process preparatory to the signing of long-term financing agreements do not constitute a clear and definite promise where the terms of the proposed agreement are not to be finally determined until a formal closing. "[T]he oral promise of a bank representative is not sufficient to support a claim of promissory estoppel where the statement did not specify the loan amount, interest rate, repayment schedule, or collateral." *Id.* at 959.[7] The court may not supply the missing terms to create an agreement. *Id.* (quoting *Doud v. First Interstate Bank of Gillette*, 769 P.2d 927, 928–29 (Wyo.1989)).

[¶ 32] Our conclusion that the district court correctly found that the Birts had failed to establish the first element of promissory estoppel obviates any need to analyze the second element. We will, however, briefly note our holding in *Davis*, 855 P.2d at 348, that "detriment in reasonable reliance is closely tied to the existence of a clear and definite agreement. A reasonable person does not rely to his or her detriment on an oral agreement unless it is sufficiently clear and definite as to induce him or her to act." Here, not only did the Birts know that the final terms of the proposed loan had not

been determined, they also knew that no loan commitment letter had been issued by Wells Fargo. Reliance on an indefinite promise is unreasonable for the same reason that courts cannot enforce such a promise—the terms remain to be determined.

[¶ 33] The district court's grant of summary judgment to Wells Fargo on the Birts' claim of promissory estoppel is affirmed.

## EQUITABLE ESTOPPEL

[¶ 34] " 'Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded from asserting rights which might otherwise have existed as against another person who has in good faith relied upon such conduct and has been led thereby to change his position for the worse.' " *Snake River Brewing Co., Inc. v. Town of Jackson*, 2002 WY 11, ¶ 28, 39 P.3d 397, 407–08 (Wyo.2002) (quoting *State Farm Mut. Auto. Ins. Co. v. Petsch*, 261 F.2d 331, 335 (10th Cir.1958)). "Equitable estoppel arises only when a party, by acts, conduct, or acquiescence causes another to change his position." *Roth v. First Sec. Bank of Rock Springs, Wyo.*, 684 P.2d 93, 96 (Wyo.1984). The elements of equitable estoppel are a lack of knowledge, reliance in good faith, and action or inaction that results in an injury. *Id.* Equitable estoppel is similar to promissory estoppel, but equitable estoppel is a tort doctrine that requires proof of misrepresentation. *B & W Glass, Inc.*, 829 P.2d at 813. In *Davis*, 855 P.2d at 348, we expanded upon the similarities between these two doctrines:

The doctrines of promissory estoppel and equitable estoppel are closely related and, as we impliedly recognized in [*Inter-Mountain Threading, Inc. v.*] *Baker Hughes [Tubular Serv., Inc.*, 812 P.2d 555

---

6. Although it is sometimes said that appellate review of proceedings in equity is de novo, in this context "de novo" generally refers to the absence of deference to the factual findings of the lower court rather than to trial de novo; the reviewing court may not try the case anew, but rather is limited to the record transmitted from the trial court.

  5 Am.Jur.2d, *supra*, § 696 at 367.

7. As discussed earlier herein, it is true that the September 12, 2000, Truth–in–Lending disclosure documents did contain the details of the proposed loan. But it is also true that the Birts knew these were "just numbers plugged in" and that a formal closing would be required to consummate the loan. Just as these governmentally required disclosures do not form the basis of an express or implied contract, neither do they constitute the promise necessary to establish promissory estoppel.

(Wyo.1991)], they often have been invoked together and interchangeably, without the benefit of clear distinction. *Baker Hughes. See also Roth v. First Sec. Bank of Rock Springs, Wyo.,* 684 P.2d 93 (Wyo.1984). Reasonable reliance is an element common to both of these doctrines. *Baker Hughes.* Thus, we find that equitable estoppel cases are cited in promissory estoppel cases with respect to this common element. In Wyoming, these doctrines most often have been presented in the context of preliminary negotiations for commercial agreements.

[¶ 35] Several pages of the Birts' appellate brief are dedicated to a detailed expostulation of the conduct of Gibbs that they feel substantiates their equitable estoppel claim: Gibbs claimed to be an expert in processing loans, so the Birts, lacking sophistication in such matters, placed their faith and trust in him; Gibbs recognized problems with the Birts' credit history as early as April 2000, yet he informed the Birts that their credit record was not a problem; Gibbs failed to tell the Birts that their pre-qualification was valid for only thirty days; Gibbs told the Birts that Mr. Birt's employment change would allow for an even higher loan amount; Gibbs did not inform the Birts when in August 2000 he identified additional credit problems that would necessitate a higher interest rate; despite these mounting problems, Gibbs continued to encourage the Birts to move forward with their project, including bidding plans, a construction loan, a survey and an appraisal; Gibbs represented both to the Birts and to Carter Brothers, as late as mid-September 2000, that a loan commitment letter imminently would follow; Gibbs constantly reassured the Birts that their loan would be approved even though he had numerous opportunities to correct this misrepresentation; and Gibbs failed to inform the Birts that plans, specifications and an appraisal had to be supplied to Wells Fargo. The Birts feel particularly aggrieved by this last-mentioned omission because it was their supposed failure to deliver those items to Wells Fargo that became the basis for Wells Fargo's primary contract defense. As a result of Gibbs' alleged misconduct, the Birts claim they were damaged by incurring fees for an architect, an appraisal, and a survey.

[¶ 36] Wells Fargo contends in response that any reliance by the Birts was unreasonable because: Gibbs made numerous requests of the Birts for the plans and specifications so an appraisal could be ordered; no loan amount was ever established; the Birts were experienced, having been through two previous house purchases; the Birts were aware of their negative credit history and the likelihood of the need for sub-prime financing with a higher interest rate; it was the Birts' own conduct after the first credit report that caused the negative entries in the second credit report; and most of the Birts' "reliance damages" were incurred before they received the disclosure documents.

[¶ 37] The district court granted summary judgment to Wells Fargo on the Birts' equitable estoppel claim on two bases. First, citing *Crosby v. Strahan's Estate,* 78 Wyo. 302, 324 P.2d 492 (1958), the district court found that the Birts had not alleged, and the record did not support, a finding of the fraud estoppel is meant to prevent. And second, citing to *McCarty v. Piedmont Mut. Ins. Co.,* 81 S.C. 152, 62 S.E. 1 (1908), the district court held that "a mere declaration of intention to do something in the future with respect to a contract not in existence cannot be the basis of an estoppel to assert a condition of the subsequently executed contract."

[¶ 38] In regard to the district court's conclusion that sufficient evidence of fraud did not exist in the record, it is true that we have identified the purpose of equitable estoppel as being "to prevent fraud, actual or constructive...." *Squaw Mountain Cattle Co. v. Bowen,* 804 P.2d 1292, 1297 (Wyo.1991). We have also said that the doctrine is to be applied to prevent injury arising from actions or declarations acted on in good faith and to promote the end of justice, where it would be inequitable not to do so, which is a standard less than actual fraud. *Id.; Garlach v. Tuttle,* 705 P.2d 828, 829 (Wyo.1985). Equitable estoppel may apply whether the actor "intentionally or through culpable negligence induces another to believe that certain facts exist...." *Thompson,* 2001 WY 108, ¶ 11, 34 P.3d at 281. In addition, it is immaterial whether the conduct

falsely misrepresented the situation or fraudulently concealed the truth. *Bauer v. State ex rel. Wyoming Worker's Compensation Div.*, 695 P.2d 1048, 1051 (Wyo.1985). While both "intentionally" and "through culpable negligence" suggest a state of mind beyond mere negligence, neither suggests the level of specific intent required to prove actual fraud.[8] Instead, equitable estoppel is designed to combat not just actual fraud, but also constructive fraud, which "consist[s] of all acts, omissions, and concealments involving breaches of a legal or equitable duty resulting in damage to another, and exists where such conduct, although not actually fraudulent, ought to be so treated when it has the same consequence and legal effects." *In re Borton's Estate*, 393 P.2d 808, 812 (Wyo.1964).

[¶ 39] As to the district court's second rationale for granting summary judgment to Wells Fargo on this issue, we conclude that the principles enunciated in *McCarty* do apply indirectly to the facts of the instant case. In *McCarty*, a homeowner, prior to purchasing insurance, told the insurer's agent that he intended to place a small mortgage on the premises. The agent assured the homeowner that this would make no difference under the policy. Some months after purchasing the insurance, the homeowner, without further consent from the insurer, did grant such a mortgage. Later, when the premises were destroyed by fire, the insurer refused to indemnify the homeowner for his loss because the policy forbade mortgaging the property without the insurer's consent. *McCarty*, 62 S.E. at 1. The specific holding of *McCarty* was that the agent's prior representations to the contrary did not estop the insurer from raising the policy term as a defense to the homeowner's claim. *Id.* at 2. In reaching this conclusion, the South Carolina Supreme Court emphasized two principles: (1) "estoppel by misrepresentation"

must involve misrepresentation of a past or existing fact and " 'cannot arise from a promise as to future action with respect to a right to be acquired upon an agreement not yet made;' " and (2) the insurance policy dictated the terms of the parties' contract. *Id.* (*quoting Union Mut. Life Ins. Co. v. Mowry*, 96 U.S. 544, 546, 24 L.Ed. 674 (1877)). In other words, once the written contract of insurance was executed, its terms prevailed over prior representations of the agent. Stated in the reverse, the agent's prior representations did not estop the insurer from enforcing the policy term.[9]

[¶ 40] *McCarty* cannot be applied directly to the case at hand because Wells Fargo and the Birts never reached final agreement. Therefore, Wells Fargo is not arguing to enforce a contract term in the face of the Birts' argument that it should be estopped from doing so. Rather, and we assume that this is the context in which the district court applied *McCarty*, Gibbs' alleged representations to the contrary notwithstanding, Wells Fargo is not estopped from asserting its right not to contract with the Birts unless and until the Birts had met all of Wells Fargo's requirements, including production of plans and specifications for an appraisal.

[¶ 41] We will affirm the summary judgment granted to Wells Fargo on the equitable estoppel claim because the essence of the district court's decision is correct. Wells Fargo's conduct, even if true as alleged, did not perpetuate a "fraud" or create the level of injustice that the doctrine is meant to remedy. That is because, even without Gibbs' allegedly poor advice, the loan application would not have been approved under the contemplated terms. The failure of the loan application in that respect resulted primarily from the Birts' poor credit rating, which rating continued to deteriorate during the

---

8. Although not in this context, we have defined "intentionally" as meaning "purposefully." *Cullin v. State*, 565 P.2d 445, 451 (Wyo.1977). In the worker's compensation context, we have defined "culpable negligence" as "willful and serious misconduct." *Brebaugh v. Hales*, 788 P.2d 1128, 1136 (Wyo.1990). The distinguishing feature of fraud is that it requires that the party made false representations with intent to induce

action by another. *Richey v. Patrick*, 904 P.2d 798, 801–02 (Wyo.1995).

9. *See Verschoor v. Mountain West Farm Bureau Mut. Ins. Co.*, 907 P.2d 1293, 1298 (Wyo.1995), for the proposition that estoppel "will not operate to create additional coverage in an existing contract of insurance."

application process due to the Birts' continued poor debt management.[10] It is well established that he who seeks equity must do so with "clean hands." *Dewey v. Wentland,* 2002 WY 2, ¶ 37, 38 P.3d 402, 416 (Wyo.2002); *Hammond v. Hammond,* 14 P.3d 199, 203 (Wyo.2000). In other words, the Birts may not rely upon equitable estoppel to compel Wells Fargo to consummate a loan where, first, the Birts cannot be said to have relied reasonably on Gibbs' assurances that the loan would be forthcoming, and second, failure of the loan application was largely due to the Birts' own financial difficulties.

### NEGLIGENT MISREPRESENTATION

[¶ 42] In their complaint, the Birts allege that, from April to October 2000, Wells Fargo negligently misrepresented to them that their loan application would be approved.[11] Perhaps the best way to discuss the tort of negligent misrepresentation is first to compare it to fraud:

> Intentional misrepresentation and negligent misrepresentation share common elements. Intentional misrepresentation (fraud) is established when the following elements are proven: "(1) the defendant made a false representation intended to induce action by the plaintiff; (2) the plaintiff reasonably believed the representation to be true; and (3) the plaintiff relied on the false representation and suffered damages." *Sundown, Inc. v. Pearson Real Estate Company, Inc.,* 8 P.3d 324, 330 (Wyo.2000). Intentional misrepresentation

must be established by clear and convincing evidence. *Id.* Quite similarly, a plaintiff in a claim for negligent misrepresentation must show:

> "One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information."

*Hulse v. First American Title Company of Crook County,* 2001 WY 95, ¶ 52, 33 P.3d 122, ¶ 52 (Wyo.2001) (quoting *Richey v. Patrick,* 904 P.2d 798, 802 (Wyo.1995)). A fundamental difference between the two causes of action is, a plaintiff need only prove negligent misrepresentation by a preponderance of the evidence, not unlike any other plaintiff in any other action sounding in negligence, while a plaintiff must prove intentional misrepresentation by clear and convincing evidence. *Verschoor v. Mountain West Farm Bureau Mutual Insurance Company,* 907 P.2d 1293, 1299 (Wyo.1995).

*Dewey,* 2002 WY 2, ¶ 10, 38 P.3d at 409–10.

[¶ 43] Similarly, negligent misrepresentation must be distinguished from the tort of nondisclosure, as described by Restatement (Second) of Torts § 551

---

10. The Birts' credit rating was lower in August 2000 than it had been in April 2000. The poor credit rating was the result of the number of unpaid and delinquent accounts, the length of time delinquencies existed, the proportion of balance to limit on revolving accounts, and amounts past due.

11. Restatement (Second) of Torts § 552 at 126–27 (1977) reads as follows:

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

(1977).[12] "A nondisclosure of information cannot support a claim for misrepresentation; since nothing has been represented, an essential element of the claim is missing." *Richey v. Patrick,* 904 P.2d 798, 802 (Wyo. 1995). This distinction is important in the instant case because, although the Birts briefed and argued non-disclosure in their appeal, they did not allege it in their complaint nor was it ruled upon by the district court. Consequently, non-disclosure as a separate tort is not properly before this Court.

[¶ 44] Analysis of the negligent misrepresentation cause of action is made difficult by the fact that the Birts' argument focuses almost entirely on non-disclosure. We can, however, glean from their arguments several points properly within the realm of alleged negligent misrepresentation. Those include allegations that: Gibbs told the Birts they could afford an architect; Gibbs told the Birts that Mr. Birt's employment change would not negatively affect the loan application; Gibbs instructed the Birts to "forge on" with the construction contract; Gibbs advised the Birts to deed their property over to Carter Brothers for construction purposes; and Gibbs informed the Birts that there should be no trouble acquiring a loan in a sufficient amount.

[¶ 45] Wells Fargo's response to these contentions is first and foremost that the Birts cannot identify any false information supplied by Wells Fargo that would rise to the level of negligent misrepresentation.

Secondarily, Wells Fargo contends that, had the Birts provided the plans and specifications as requested, a loan amount may have been determined and the loan may have been made. In other words, any loss suffered by the Birts was caused by their own inaction.

[¶ 46] The district court granted summary judgment to Wells Fargo on the issue of negligent misrepresentation, with the following explanation:

The Birts use this theory as a back up to their contention that the bank promised to lend money. A failed promise cannot be converted into a viable theory by virtue of the doctrine of negligent misrepresentation. Negligent misrepresentation requires that the wrongdoer have a pecuniary interest in the matter and supply false information for the guidance of others in their business transactions. It involves situations in which one enterprise provides information to another enterprise that in turn predicates a decision upon the information. None of the examples in Restatement (Second) of Torts § 552 embody the reach for which the Birts argue. Moreover, a good faith mistake doesn't trigger this tort. This record provides no basis to allow negligent misrepresentation to go forward.

[¶ 47] We will affirm the summary judgment entered in favor of Wells Fargo. The gist of the district court's reasoning, which is correct, is that negligent misrepresentation does not apply to misrepresentations of future

12. Restatement (Second) of Torts, *supra,* § 551 at 119 reads as follows:

(1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.
(2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,
(a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and

(b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and
(c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and
(d) the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and
(e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

intent or to statements of opinion. The tort of negligent misrepresentation, as defined by Restatement (Second) of Torts, *supra*, § 552, applies only to misrepresentations of facts. *Sain v. Cedar Rapids Community School Dist.*, 626 N.W.2d 115, 127 (Iowa 2001); *Bittel v. Farm Credit Services of Cent. Kansas*, 265 Kan. 651, 962 P.2d 491, 500–01 (1998). Indeed, the extension of negligent misrepresentation to situations involving future intentions would " 'endow every breach of contract with a potential tort claim for negligent promise.' " *Wilkinson v. Shoney's, Inc.*, 269 Kan. 194, 4 P.3d 1149, 1167 (2000) (*quoting Eckholt v. American Business Information, Inc.*, 873 F.Supp. 526, 532 (D.Kan.1994)). The question of whether the alleged misrepresentation was one of present fact or of opinion or of future intention is a question of law. *Wilkinson*, 4 P.3d at 1165; *Bittel*, 962 P.2d at 501.[13]

[¶ 48] The undisputed facts of this case do not support a cause of action for negligent misrepresentation because Gibbs' alleged misrepresentations may all be characterized as statements of his opinion as to the progress of the loan or statements as to his expectation that the loan would be made. The gravamen of the Birts' claim is an allegation of just the sort of "negligent promise" to which the cause of action should not be extended.

## NEGLIGENCE

[¶ 49] There are four elements to a negligence cause of action: (1) the defendant owed the plaintiff a duty to conform to a specified standard of care; (2) the defendant breached the duty of care; (3) the defendant's breach of the duty of care proximately caused injury to the plaintiff; and (4) the injury sustained by the plaintiff is compensable by money damages. *Valance v. VI-Doug, Inc.*, 2002 WY 113, ¶ 8, 50 P.3d 697,

701 (Wyo.2002). Whether a duty exists is a question of law for the court. *Id.* However, when the question of duty depends upon the initial determination of certain basic facts, that initial determination is a question of fact for the fact-finder. *Id.*

[¶ 50] Professor Burman has identified four types of negligence claims in lender liability cases: negligent misrepresentation, negligent advising, negligent lending, and negligent breach of contract. John M. Burman, *Lender Liability in Wyoming*, XXVI Land & Water L.Rev. 707, 742 (1991). We have already concluded that there was no contract between Wells Fargo and the Birts, so the fourth-listed claim is not available. Likewise, we have also concluded that a cause of action for negligent misrepresentation does not lie under the circumstances of this case. Negligent lending, which presupposes a consummated loan, has not been alleged by the Birts nor has it yet been adopted in Wyoming. *See* Burman, *supra*, XXVI Land & Water L.Rev. at 745. The remaining claim, for negligent advising, has been described as follows:

One of the more recent developments in lender liability has been the recognition of a cause of action for negligent advising. As with all negligence actions, a claim for negligent advising is dependent upon the lender's having a duty to advise.

A lender's duty to advise a borrower may arise in two situations. First, under traditional negligence principles, a lender that gratuitously renders advice assumes an obligation to provide sound advice. Second, the existence of a special relationship between the lender and the borrower may give rise to an obligation to proffer advice; that advice, of course, must be sound. Unless the lender has or assumes a duty to give sound advice, the failure to

---

**13.** In an appropriate case, and where adopted, Restatement (Second) of Torts, *supra*, § 530 at 64 describes the tort of "misrepresentation of intention":

(1) A representation of the maker's own intention to do or not to do a particular thing is fraudulent if he does not have that intention.
(2) A representation of the intention of a third person is fraudulent under the conditions stated in § 526.

It seems logically impossible for a cause of action under Restatement (Second) of Torts, *supra*, § 530 to be based upon a negligent misrepresentation. One either has a certain intent or one does not. *See Wilkinson*, 4 P.3d at 1166 and *Bittel*, 962 P.2d at 499. At any rate, Restatement (Second) of Torts, *supra*, § 530 and misrepresentation of intention has not been pled or argued in the present case.

render sound advice, or the failure to give any advice, is not actionable, provided the lender acts in good faith.

*Id.* at 743–44 (footnotes omitted). In addition to the two above-described situations, the duty to proffer sound advice may arise where the lender participates in a specialized field of lending, such as agricultural lending, and the standard of care in that field expects such lenders to render sound advice to borrowers. *Id.* Aside from these specialized situations, the relationship between a lender and borrower is simply that of creditor and debtor. *Martinez v. Associates Financial Services Co. of Colorado, Inc.*, 891 P.2d 785, 788 (Wyo.1995).

[¶ 51] As with negligent misrepresentation, analysis of the negligence claim is made more difficult by the varying arguments presented by the Birts. In their complaint, they stated Wells Fargo's duty as "the duty to exercise the care and competence which the lender professes to have simply by engaging in the business of lending money." In their appellate brief, they cited Cappello and Komoroske, *Lender Liability* § 18.02 at 18–2 (Lexis 3d ed.1999), for the similar proposition that "lenders are expected to exercise ordinary care in handling business." The Birts also characterize this duty as "the duty to exercise due care, in processing the Birts' loan application." [14]

[¶ 52] The Birts alleged in their complaint that Wells Fargo breached its duty to them by:

(a) negligently inducing a false sense of security in a relationship with [Wells Fargo];

(b) negligently failing to advise and consult with [the Birts] concerning the status of their loan;

(c) negligently impairing [the Birts'] credit rating with excessively frequent credit inquiries;

(d) ... failing to use and provide common loan knowledge concerning the consequences of a change of employment;

(e) negligently inducing confidence of [the Birts] in the lender's intentions to extend financing to [the Birts] beyond [Wells Fargo's] apparent knowledge.

[¶ 53] In the section of their appellate brief dealing with negligence, the Birts contend that Wells Fargo breached its duty in the following particulars:

1. Repetitive assurances that there were no problems with the loan application.

2. Voluntary and undisclosed conduct as a mortgage broker rather than a mortgage lender.

3. The haphazard pulling of credit reports.

[¶ 54] Wells Fargo contests the negligence claim by asserting that it owed no duty to the Birts upon which such a claim could be based. The district court granted summary judgment to Wells Fargo on the negligence claim on just that basis: "[t]o the extent that the negligence claim refers to deviation from banking standards, the claim must fail because of lack of duty owed to the Birts."

[¶ 55] We affirm the summary judgment granted to Wells Fargo on the negligence cause of action. Absent special circumstances, a lending institution and its customer are simply creditor and debtor. *Martinez*, 891 P.2d at 788. We have not to date recognized or adopted a general noncontractual duty that might be characterized as the duty of "a reasonably competent banker." *See Schuler v. Community First Nat. Bank*, 999 P.2d 1303, 1305 (Wyo.2000). Furthermore, where the gravamen of a plaintiff's negligence claim is actually negligent misrepresentation, no separate cause of action sounding in negligence should lie. *See Standard Chartered PLC v. Price Waterhouse*, 190 Ariz. 6, 945 P.2d 317, 340–42 (1996) (auditor negligence claim was simply a negligent misrepresentation claim).

[¶ 56] The instant case simply does not provide the appropriate avenue for extending

---

14. Some courts have recognized a particular claim for negligence in processing loan applications. *See High v. McLean Financial Corp.*, 659 F.Supp. 1561, 1570 (D.D.C.1987); *First Federal Sav. & Loan Ass'n of Hamilton v. Caudle*, 425 So.2d 1050, 1052 (Ala.1982); *Jacques v. First Nat. Bank of Maryland*, 307 Md. 527, 515 A.2d 756, 762 (1986), *cert. denied*, 309 Md. 456, 524 A.2d 1234 (1987); and Burman, *supra*, XXVI Land and Water L.Rev. at 745 n. 298.

liability to a lending institution in its relationship with a potential customer. Distinctions between the negligent advising cause of action Professor Burman describes and the instant case can readily be discerned. First, the instant case in no way represents the specialized type of lending that would impose additional duties on a lender. Burman, *supra,* XXVI Land & Water L.Rev. at 744–47. The loan process represented in this case was no more than the common mortgage-lending situation undertaken by lending institutions. In fact, the parties had not yet even entered into a debtor and creditor relationship. The Birts were simply prospective borrowers and Wells Fargo a prospective lender.

[¶ 57] Second, Professor Burman's article suggests that negligent advising on the part of a lender indicates that the lender has undertaken to offer the borrower advice on financial or business matters *other than the loan itself. Id.* at 743–45 (emphasis added). In the instant case, Gibbs did not undertake to offer financial or business advice to a borrower, he was merely trying to make a loan. Gibbs did nothing more than tell the Birts to continue to prepare for the prospective closing of a loan. The negligent advising cause of action described by Professor Burman applies when the lender voluntarily undertakes to offer financial or business advice. Here, the parties were in the negotiation phase of an arms-length business transaction, and Gibbs merely made suggestions to further the purpose of those negotiations.

[¶ 58] Furthermore, a closer look at the case Professor Burman cites for the negligent advising cause of action suggests facts quite different from the ones now before us. In that case, the lending institution provided the borrower with a specific business plan to follow. *Production Credit Ass'n of West Cent. Wisconsin v. Vodak,* 150 Wis.2d 294, 441 N.W.2d 338, 342–43 (1989). In effect, the lender inserted itself into the borrower's business. As the Vodaks' creditor, the lending institution used its position essentially to dictate and control the Vodaks' business decisions. In that sense, the lender took on a role similar to that of a managing partner. The lender gave advice on the borrower's financial and business decisions and, by doing so, assumed an obligation to render sound advice. In *Vodak,* the lender acted as a financial advisor to a subservient borrower, and the borrower relied on the lender's advice. The negligent advising cause of action recognized in that case resulted from the lender inserting itself into the borrower's business, not from the lender's conduct in the loan application process.

[¶ 59] The instant case presents a much different scenario. The Birts were in the process of applying for a loan. Wells Fargo undertook no duty to advise the Birts outside of that process. At no time did Wells Fargo cross the line between a lender and an operating partner or general financial advisor. The cause of action for negligent advising is simply not appropriate in this case. Liability to a borrower for negligent advising should only arise when the lender actively participates in the financed enterprise beyond the usual domain of the money lender. *Wagner v. Benson,* 101 Cal.App.3d 27, 35, 161 Cal.Rptr. 516, 521 (1980). Otherwise, we will have abandoned the rule that lenders and their customers merely have a creditor and debtor relationship, and we will have subjected lenders to potential liability for negligent advising whenever a potential loan does not materialize.

### BREACH OF FIDUCIARY DUTY

[¶ 60] Count Ten of the Birts' complaint alleged that Wells Fargo had created a fiduciary duty to the Birts in the following manner:

> Due to their lack of experience in obtaining a home loan the [Birts] sought the guidance and advice of [Wells Fargo]. [Wells Fargo] directed the conduct of the [Birts] and encouraged them throughout the entire process of securing a loan and contracting for the construction of a house. [Wells Fargo], therefore created a fiduciary duty between itself and the [Birts].

The complaint then alleged that Wells Fargo breached its fiduciary duty by:

> (a) Improperly inducing reliance by making promises of a forthcoming of a loan;

(b) Stating that Mr. Birt's overtime and bonus pay could be considered for purposes of acquiring a loan;

(c) Stating Mr. Birt's change in employment would not adversely affect the [Birts'] chances at acquiring a loan;

(d) Encouraging [the Birts] to employ the service of an architect; and

(e) Improperly encouraging the [Birts] to enter into a contract with Carter Bros. when it had knowledge that no loan funds would be disbursed.

[¶ 61] In their appellate brief, the Birts emphasized two inter-related factors in support of this argument. First, Gibbs, who was the sophisticated party in their dealings, held himself out as an expert and voluntarily invited them to rely on his advice. Second, the Birts, who lacked financial sophistication, "placed their full trust and reliance in ... Gibbs, to guide and direct them through the process...." The Birts contend that the resultant "unique relationship" created in Well Fargo a fiduciary duty to them.

[¶ 62] Wells Fargo countered this argument largely by asserting that the type of special relationship necessary to support a fiduciary duty in these circumstances is extraordinary, is not easily created, and must be shown by clear and convincing evidence. *See Martinez*, 891 P.2d at 789. Relying on *Martinez*, the district court agreed and determined that "the mere existence of a course of dealings" in which the Birts negotiated with Wells Fargo to obtain a loan did not create a fiduciary duty.

[¶ 63] *Martinez* is, indeed, guiding precedent on this issue. In that case, as we have noted previously herein, we held that the lender/borrower relationship, without more, is fundamentally a creditor/debtor relationship. *Id.* at 788. We also held, however, that "lenders *may* incur extra-contractual duties to customers through conduct which creates a special or fiduciary relationship." *Id.* at 789 (emphasis in original). We further described this relationship as one " 'implied in law due to the factual situation surrounding the involved transactions and the relationship of the parties to each other and to the questioned transactions.' " *Id.* (quoting

*Denison State Bank v. Madeira*, 230 Kan. 684, 640 P.2d 1235, 1241 (1982)).

[¶ 64] Professor Burman suggests that a fiduciary relationship may be created between a lender and a borrower when the lender "goes beyond simply providing money to the borrower and offers advice and consultation." Burman, *supra*, XXVI Land & Water L.Rev. at 713–14. Other factors that may play a role in creating fiduciary duties on the part of the lender include the lender's involvement in the operation of the borrower's business, the borrower's lack of sophistication, and the borrower's involvement in a business with a special nature. *Id.* at 718, 640 P.2d 1235.

[¶ 65] We will affirm the summary judgment granted to Wells Fargo on this issue because we conclude that the facts of this case do not establish the existence of a special or fiduciary relationship between Wells Fargo and the Birts sufficient to create a separate cause of action. A borrower's burden in establishing a duty on the part of a lender to provide sound advice, under a negligent advising theory, is less than the burden in establishing the type of special relationship that will support a cause of action for breach of fiduciary duty. In the latter situation, something akin to an extended course of dealings, in a long-term business setting, with a history of the borrower's reasonable reliance upon the lender, must be shown. *Id.* at 714, 640 P.2d 1235. The facts of the instant case simply do not resemble that unique situation. Were we to find the existence of a special or fiduciary relationship in this case, we would be abandoning the principle that the lender/borrower relationship, without more, is a creditor/debtor relationship, and we would be subjecting potential lenders to fiduciary duties in most loan applications.

INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONSHIP

[¶ 66] The Birts' final claim against Wells Fargo is an allegation of intentional interference with the contractual relationship between the Birts and Carter Brothers. This tort is actually a collection of torts, and it requires some pleading specificity. Before

we discuss the allegations of the instant case, it will be helpful to review the current status of Wyoming's "intentional interference" law.

[¶ 67] In *Wartensleben v. Willey,* 415 P.2d 613, 614 (Wyo.1966), we adopted Restatement of Torts § 766 (1939), which provided as follows:

> Except as stated in Section 698, one who, without a privilege to do so, induces or otherwise purposely causes a third person not to
>
> (a) perform a contract with another, or
>
> (b) enter into or continue a business relation with another
>
> is liable to the other for the harm caused thereby.

[¶ 68] The central issue in *Wartensleben,* which involved a landowner's attempt to prevent establishment of a feedlot on neighboring property, was whether the landowner's conduct was justified. We decided that issue under Restatement of Torts § 773 (1939), which reads as follows:

> One is privileged purposely to cause another not to perform a contract, or enter into or continue a business relation, with a third person by in good faith asserting or threatening to protect properly a legally protected interest of his own which he believes may otherwise be impaired or destroyed by the performance of the contract or transaction.

[¶ 69] A dozen years after *Wartensleben,* in the case of *Board of Trustees of Weston County School Dist. No. 1, Weston County v. Holso,* 584 P.2d 1009, 1016–17 (Wyo.1978), we noted that Restatement of Torts § 766 (1939) dealt with two situations: inducement of a third person to breach a contract with another and inducement of a third person not to enter into a contract with another. We identified the elements of the tort as:

> "(1) the existence of a valid contractual relationship or business expectancy;

> (2) knowledge of the relationship or expectancy on the part of the interferor;

> (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and

> (4) resultant damage to the party whose relationship or expectancy has been disrupted."

*Holso,* 584 P.2d at 1016–17 (*quoting Olson v. Scholes,* 17 Wash.App. 383, 563 P.2d 1275, 1279–80 (1977)) After noting that the controversy in that employer-employee contest was the employer's alleged interference with the employee's future employment prospects, we held that Restatement of Torts, *supra,* § 766 did not apply because that tort does not lie against one of the parties to the contractual relationship, but only against interfering "outsiders." [15] *Holso,* 584 P.2d at 1017; *see also Kvenild v. Taylor,* 594 P.2d 972, 976–77 (Wyo.1979) (vendor and her real estate agent could not be liable for tortious interference with a contract to which vendor was a party.).

[¶ 70] In *Holso,* 584 P.2d at 1016, we noted that the separate causes of action— "interference with contractual relations" and "interference with prospective advantage"— "tend to merge." We again discussed that tendency in *Martin v. Wing,* 667 P.2d 1159, 1161 (Wyo.1983), where we concluded that "a valid contract is not always necessary," and that liability may arise under Restatement (Second) of Torts § 766B (1979), where the relationship is prospective only. *Martin,* 667 P.2d at 1162; *see also Doud,* 769 P.2d at 930–31.

[¶ 71] The Restatement (Second) of Torts § 766 at 7, 17, 20 (1979) now clearly distinguishes the separate causes of action identified as "intentional interference with contract":

> § 766 Intentional Interference with Performance of Contract by Third Person

---

**15.** There may be some question as to whether this principle was appropriately applied to the facts in *Holso.* Holso, a school teacher, alleged that the Board attempted to carry out the school superintendent's "threat" that, "[w]hen I get through with you there won't be a school in the country that will offer you a teaching job." *Hol-*so, 584 P.2d at 1016. Clearly, this is not an allegation that the Board was improperly interfering with Hoslo's employment by that Board, but was improperly interfering with Hoslo's prospects for future employment in other school districts.

One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

. . .

§ 766A  Intentional Interference with Another's Performance of His Own Contract

One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person, by preventing the other from performing the contract or causing his performance to be more expensive or burdensome, is subject to liability to the other for the pecuniary loss resulting to him.

. . .

§ 766B  Intentional Interference with Prospective Contractual Relation

One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of

(a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or

(b) preventing the other from acquiring or continuing the prospective relation.

[¶ 72]  Analytically, Restatement (Second) of Torts, *supra*, § 766 deals with the situation where A may be liable to B for causing C not to perform a contract between B and C; § 766A deals with the situation where A may be liable to B for preventing B from performing a contract between B and C; and § 766B deals with the situation where A may be liable to B for causing C not to enter into or continue a prospective contractual relationship with B or for preventing B from entering into or continuing a prospective contractual relationship with C.[16]

[¶ 73]  Wyoming has adopted both Restatement (Second) of Torts, *supra*, §§ 766 and 766B. *Lever v. Community First Bancshares, Inc.*, 989 P.2d 634, 639 (Wyo.1999). On the other hand, we have declined to adopt § 766A. *Price v. Sorrell*, 784 P.2d 614, 615 (Wyo.1989).  Consequently, under the current state of Wyoming law, the Birts could have alleged a cause of action against Wells Fargo for:  (1) improperly inducing or otherwise causing Carter Brothers to breach its contract with the Birts;  or (2) improperly inducing or otherwise causing Carter Brothers not to enter into or continue a prospective contractual relation with the Birts;  or (3) improperly preventing the Birts from acquiring or continuing a prospective contractual relation with Carter Brothers.[17]

[¶ 74]  It is in this legal context that we must attempt to determine whether the district court was correct in granting summary judgment to Wells Fargo on the issue of intentional interference with contract.  The specific allegations in the complaint are found in the following paragraphs:

14. . . . The [Birts] both signed the construction contract with Carter Bros. that afternoon, which contract was in the amount of $234,744.00.

. . .

47. [Wells Fargo] intentionally interfered with the contractual relationship between the [Birts] and Carter Bros.

---

**16.** There is also Restatement (Second) of Torts, *supra*, § 766C, which limits A's potential liability where his conduct in such situations has only been negligent, as opposed to intentional.

**17.** It does not appear to be logically consistent for this Court to have adopted all of Restatement (Second) of Torts, *supra*, § 766B, while rejecting § 766A. Subsection (a) of § 766B applies the concept of § 766—A causing C to breach a contract with B—to the prospective contract setting. Inasmuch as we have adopted § 766, it was consistent to adopt subsection (a) of § 766B. Subsection (b) of § 766B applies the concept of § 766A—A preventing B from performing a contract with C—to the prospective contract setting. Inasmuch as we have rejected § 766A, it was inconsistent to adopt subsection (b) of § 766B. Nevertheless, that is now the law in Wyoming, and neither party in the instant case has addressed this seeming inconsistency or asked that it be corrected.

48. [Wells Fargo] knew, or should have known, that a denial of the loan funds would cause an immediate breach in the contract between [the Birts] and Carter Bros.

[¶ 75] These paragraphs from the complaint clearly set forth an allegation that Wells Fargo interfered with an existing contract between the Birts and Carter Brothers. That is an allegation under either Restatement (Second) of Torts, *supra*, § 766 or § 766A, and not an allegation under § 766B. What is not clear from the complaint is whether the allegation is an improper inducement of Carter Brothers not to perform, as under § 766, or an improper prevention of the Birts' performance, as under § 766A. That question is answered in favor of § 766A, despite the fact that no reference is made to any particular section, by the fact that the Birts present no evidence suggesting that Wells Fargo induced or caused Carter Brothers to breach the contract, and by the following arguments made by the Birts, the first to the district court in opposing summary judgment, and the second to this Court in an appellate brief:

[Wells Fargo] has provided no law or argument that a contract did not exist between [the Birts] and Carter Brothers Construction, no evidence that it was somehow unaware of that contract, *or that its actions did not impact upon the ability of [the Birts] to fulfill the contract.*

(Emphasis added.)

Wells Fargo was reasonably certain that failure to provide the promised commitment letter and financing *would force the Birts to breach the contract with Carter Bros.*

(Emphasis added.)

[¶ 76] Wells Fargo did not defend against this claim by pointing out that Wyoming has not adopted Restatement (Second) of Torts, *supra*, § 766A. Instead, Wells Fargo presented three arguments: (1) the Birts could identify no " 'affirmative inducement, com-

pulsion or pressure' " that resulted in breach of the contract; (2) Wells Fargo was merely asserting a bona fide claim in good faith; and (3) there was no contract between the Birts and Carter Brothers because any such contract was subject to the condition precedent that the Birts obtain financing. In granting summary judgment to Wells Fargo, the district court adopted the reasoning of the third argument:

The contract with Carter Brothers to build the house was subject to a take out loan. The Birts had not obtained such a loan. So, there was no binding agreement. Absent a binding agreement, there can be no interference.

[¶ 77] We may affirm a summary judgment on any legal basis supported by the record. *Grose v. Sauvageau*, 942 P.2d 398, 402 (Wyo.1997). In the instant case, we cannot accept the circular reasoning of Wells Fargo's third argument and the district court's conclusion based on that argument. It is hardly sufficient to say that Wells Fargo did not cause a breach of the construction contract by failing to make the construction loan because obtaining a construction loan was a condition precedent to the contract's existence! Beyond that, the contract had been signed by both parties. While Carter Brothers' duty to begin construction may have been conditioned upon receipt of the loan commitment letter, it cannot be said that a contractual relationship had not been formed between the Birts and Carter Brothers.

[¶ 78] We will affirm the summary judgment, however, because the record clearly establishes that the claim of intentional interference with a contract was based on Restatement (Second) of Torts, *supra*, § 766A, which tort has been expressly rejected in this jurisdiction. Since there was no effort to convince this Court to abandon that precedent, and because the issue is so significant in the context of lender liability, we are not inclined to pursue such a course in the absence of thorough briefing and argument.[18]

18. *See* Burman, *supra*, XXVI Land & Water L.Rev. at 740–42, for a dissection of the rejection of Restatement (Second) of Torts, *supra*, § 766A in *Price*, and Professor Burman's prediction that

"[t]here is little likelihood, therefore, that a borrower will succeed in recovering from a lender under section 766A." In *Ames*, 850 P.2d 607 at 611, we affirmed a judgment NOV in favor of a

Resolution of the issue on this basis makes it unnecessary to consider whether Wells Fargo's conduct was done in good faith to assert a legally protected interest.[19]

## CONCLUSION

[¶ 79] We affirm the Order Denying Defendant's Motion to Dismiss and Granting Defendant's Motion for Summary Judgment because there are no genuine issues of material fact and Wells Fargo is entitled to judgment as a matter of law.

lender, where one of the borrower's allegations was that the lender's failure to renew a loan interfered with the borrower's ability to make payments under a different contract. The question of the adoption or rejection of § 766A did not arise in that case, which was resolved on other grounds.

19.  *See* Restatement (Second) of Torts § 773 (1979); *Examination Management Services, Inc. v. Kirschbaum*, 927 P.2d 686, 697–99 (Wyo. 1996); *Century Ready–Mix Co. v. Campbell County School* Dist., 816 P.2d 795, 800 (Wyo.1991); and *Basin Elec. Power Co-op.-Missouri Basin Power Project v. Howton*, 603 P.2d 402, 404–05 (Wyo.1979).