FILED
United States Court of Appeals
Tenth Circuit

November 28, 2007

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

MEMORIAL HOSPITAL OF
LARAMIE COUNTY d/b/a UNITED
MEDICAL CENTER and UNITED
MEDICAL HEALTH SERVICES
CORPORATION,

         Plaintiffs-Appellants,

    v.

HEALTHCARE REALTY TRUST
INCORPORATED, and
HEALTHCARE REALTY SERVICES,
INCORPORATED,

         Defendants-Appellees.

No. 06-8051

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING
(D.C. NO. 05-CV-209-J)**

---

John B. "Jack" Speight, Speight, McCue & Associates, P.C., Cheyenne, Wyoming
(Robert T. McCue, Speight, McCue & Associates, P.C., Cheyenne Wyoming, W.
Perry Dray, Dray, Thomson & Dyekman, P.C., Cheyenne, Wyoming, Amanda
Hunkins Newton, Jones, Jones, Vines and Hunkins, Wheatland, Wyoming, with
him on the briefs), for Plaintiffs-Appellants.

C. Mark Pickrell, Waller Lansden Dortch & Davis, LLP, Nashville, Tennessee,
(Rhonda A. Scott and Manisha Desai, Waller Lansden Dortch & Davis, LLP,
Nashville, Tennessee, J. Nicholas Murdock, Murdock Law Firm, P.C., Casper,
Wyoming, Cody L. Balzer, Balzer Law Firm, P.C., Loveland, Colorado, with him
on the brief), for Defendants-Appellees.

Before **LUCERO**, **ANDERSON**, and **McCONNELL**, Circuit Judges.

**McCONNELL**, Circuit Judge.

This case concerns several contract and tort claims arising out of the planning, construction, and operation of a medical office building in Cheyenne, Wyoming. That project turned out to be a financial disaster for the plaintiff, Memorial Hospital of Laramie County, which has sued its consultant and de facto landlord, Healthcare Realty. The district court dismissed all of Memorial Hospital's claims on summary judgment. Because we find that there are disputed issues of fact material to two of these claims—for tortious misrepresentation and contractual bad faith—we reverse the district court's decision in part and affirm in part.

## I. BACKGROUND

### A. The Parties' Dealings

In the late 1990s, Memorial Hospital of Laramie County (d/b/a United Medical Center) began planning the construction of a new medical office building on its campus in Cheyenne, Wyoming. In 1997, Memorial Hospital retained a consultant—Healthcare Realty Management, Inc. ("HRM"), a wholly owned subsidiary of Healthcare Realty Trust, Inc. ("HRT"). (We will call them both

Healthcare Realty, for simplicity's sake.)  Healthcare Realty had expertise in building and managing medical office buildings, and the Hospital asked the company to assess the market for such a building and the feasibility of constructing and managing it.

In 1998, Healthcare Realty provided Memorial Hospital with a "Feasibility Study and Funding Analysis," which concluded that market demand was sufficient for a 42,480-square-foot building and advised that the building should be less than 140,000 square feet.  The study specifically warned that a large facility might be unprofitable because it would be hard to rent that much space.  The report also presented five funding and ownership options for the building.  The first four were each accompanied by an analysis of advantages and disadvantages.  The fifth—styled "HRM Ownership Under a Property Operating Agreement"—was billed as a "response to the unfavorable accounting and the negative operational results associated with" the other options and listed no disadvantages.  *Id*. at 80.

Under the suggested operating agreement, the Hospital would control tenancy and operational decisions but Healthcare Realty would finance the construction and hold title to the building, allowing the Hospital to benefit from "favorable off-credit accounting treatment."  *Id.*  Each month, the Hospital would pay "the deficiency, if any, between the net operational cash flow of the facility and HRM's pre-determined yield requirement on its equity investment in the

facility." *Id.* at 80. In other words, Healthcare Realty would own the building, but Memorial Hospital would assume most of the associated financial risks.

In response to Healthcare Realty's warnings about facility size, the Hospital explained in a letter that it "purposely oversized the structure to allow for expansion" and believed a larger facility "eventually will be fully occupied." App. 357. The Hospital therefore retained Healthcare Realty to perform further modeling on a larger building. Healthcare Realty agreed to "create, prepare, and refine a series of ownership models and ownership scenarios for a proposed 170,000 gross square foot" facility. *Id.* at 363. A Memorial Hospital executive sent a letter to Healthcare Realty, saying that the Hospital "desires HRT's participation in the project in some form, regardless of ownership." *Id.* at 370. The letter acknowledged that because of Healthcare Realty's concerns about the size of the building, any agreement to build a large building would require Memorial Hospital to provide long-term financial guarantees.

On April 8, 1999, the parties executed a letter of intent, stating that they would enter into an operating agreement similar to the one detailed in the feasibility study, for a building "currently estimated at 122,850 (rentable) square feet" at a cost of approximately $16.2 million. *Id.* at 377. Over the course of the next several months, Healthcare Realty provided the Hospital with analyses of the financial outlook for a building with 142,000 gross (137,196 rentable) square feet. These materials were styled as an "Assessment of the Property Operating

-4-

Agreement" ("APOA") and an "Assessment of Building Vacancy" ("ABV"). App. 510, 513. The ABV calculated what the Hospital's surplus or shortfall would be over the first five years of operation given different levels of occupancy. The APOA is a single page document that explains the basic structure of the Operating Agreement and provides two examples of Memorial Hospital's financial obligations, showing a surplus for the Hospital in the sixth year if the building were 95% occupied.

On November 4, 1999, the Hospital and Healthcare Realty entered a Property Operating Agreement ("POA"). Healthcare Realty agreed to build and own a 142,913-gross-square-foot medical building on the Hospital's campus. The Hospital retained certain approval and management rights and agreed to pay a monthly "Operations Payment." This payment was an "Operations Base" of $137,302 per month plus inflation and capital additions, minus any net revenues from the building. *Id.* at 111. The agreement also gave the Hospital an option to purchase the facility after twenty years. Exhibits, including two budgets relevant to this litigation, were also attached.

Over the ensuing months, several developments affected the financial health of the project. First, Memorial Hospital initiated several revisions to the construction plan that required the outlay of unbudgeted money by Healthcare Realty. Second, building space did not lease quickly. Third, it became apparent

that the building's actual costs would be substantially higher than Healthcare Realty's original budgets had indicated.

In light of these developments, the parties executed three amendments to the POA. First, on February 1, 2001, Healthcare Realty agreed to purchase medical office space occupied by one medical provider elsewhere in Cheyenne to induce it to lease space in the new building. Second, on August 29, 2001, the parties agreed to push the commencement date of the agreement back from November 4, 1999, to April 1, 2001. Third, effective July 1, 2002, Healthcare Realty agreed to exclude some tenant improvement costs from its calculation of the Hospital's "Operations Base"and to postpone the date upon which the Hospital became responsible for "Operations Payments." In the third Amendment, the parties also included a ratification clause that represented that neither party was in default under the POA.

As of November, 2005, the medical office building was 88% occupied and the Hospital's yearly shortfall under the Operating Agreement—that is, the amount it owed Healthcare Realty—was $967,759, or nearly ten times the figure projected in the ABV.

### B. This Litigation

On July 25, 2005, Memorial Hospital sued Healthcare Realty in federal district court in diversity alleging four causes of action: (1) the tort of negligent

misrepresentation, for which the Hospital sought damages; (2) misrepresentation in contract, for which the Hospital sought rescission; (3) breach of the duty of good faith and fair dealing (in tort and contract), for which the Hospital sought damages; and (4) mutual mistake in contract, for which the Hospital sought rescission and restitution. Healthcare Realty counterclaimed for a declaration of contract validity and for damages based on anticipatory breach of contract.

The district court granted summary judgment in Healthcare Realty's favor on each of Memorial Hospital's claims. As to negligent misrepresentation, the court held that omitted figures, projections, and opinions did not satisfy the elements of the tort. As to the contractual misrepresentation claim, the court found that "the sheer impossibility of a return to the pre-contract stage . . . counsel[ed] against the equity of rescission," and that "the record [was] devoid of a *genuine* issue of material fact that the complained of misrepresentations were anything other than opinions, projections, and predictions of future occurrences, not statements of existing fact." App. 743. As to the good faith and fair dealing claim, the court found that under Wyoming tort law the implied covenant of good faith and fair dealing applied only in the employment and insurance contexts, and that under Tennessee contract law Healthcare Realty delivered on what it promised in the contract: "the building . . . to [Memorial Hospital's] exact structural preferences." *Id.* at. 750. "[N]ot a single financial projection or cost estimation was promised or expressly guaranteed by HRT at peril of breach." *Id.*

at 751.  As to the mutual mistake claim, the court held that the mistake was not mutual because the evidence did not establish that Healthcare Realty was mistaken.  Last, the court declared moot Healthcare Realty's counterclaim for declaratory judgment.[1]

## II.  DISCUSSION

## A.  Preliminary Matters

This is a summary judgment motion, which we review *de novo* while viewing the evidence in the light most favorable to Memorial Hospital.  It is also a diversity case, which means that "we apply state law with the objective of obtaining the result that would be reached in state court." *Butt v. Bank of Am., N.A.*, 477 F.3d 1171, 1179 (10th Cir. 2007).  To determine what states' laws apply, we use the choice-of-law rules of Wyoming, because that is where the district court sat.  *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Century 21 Real Estate v. Meraj Int'l Inv. Corp*, 315 F.3d 1271, 1281 (10th Cir. 2003).  The parties agree that these rules provide that the Hospital's tort claims are governed by Wyoming law and its contract claims are governed by Tennessee law.

---

[1]Healthcare Realty voluntarily dismissed the counterclaim for anticipatory breach in October 2005.

**B. Negligent Misrepresentation in Tort**

Despite achieving 88% occupancy in the new medical office building, Memorial Hospital owed Healthcare Realty almost one million dollars under the agreement in 2005. The Hospital maintains that Healthcare Realty led it to believe that it would owe substantially less by that time, and might even be turning a profit. The Hospital's claim that Healthcare Realty committed negligent misrepresentation should survive summary judgment.

Negligent misrepresentation is a tort. Under Wyoming law:

> [o]ne who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Richey v. Patrick*, 904 P.2d 798, 802 (Wyo. 1995) (quoting Restatement (Second) of Torts § 552(1)) (emphasis omitted). As described in greater detail below, Memorial Hospital has presented evidence from which a reasonable jury might conclude that Healthcare Realty negligently supplied it with false information about the financial prospects of the office building, on which it justifiably relied in entering the real estate deal. We therefore conclude that the district court erred in granting summary judgment on this claim.

The district court granted summary judgment for the defendant on the ground that the statements by Healthcare Realty on which Memorial Hospital relies were mere predictions or projections, and thus outside the scope of the tort of negligent misrepresentation under Wyoming law. The Wyoming Supreme Court has held that statements of opinion or intent are generally exempt from the tort of negligent misrepresentation. *See Birt v. Wells Fargo Home Mortg., Inc.*, 75 P.3d 640, 658 (Wyo. 2003). In *Birt*, Wells Fargo made comments to Mr. and Mrs. Birt implying that their application for a home loan would be approved. Relying on those statements, the Birts signed an expensive construction contract. When their loan was denied, they sued for negligent misrepresentation. The Wyoming Supreme Court refused to hold Wells Fargo liable because it found that the misrepresentation tort did not apply to promises, but only to facts. The court explained that "the extension of negligent misrepresentation to situations involving future intentions would endow every breach of contract with a potential tort claim for negligent promise." *Id.* (internal quotation marks omitted).

On the other hand, in *Gould v. James*, 299 P. 275 (Wyo. 1931), the Wyoming Supreme Court held that a salesman who misrepresented the value of land in Texas and its suitability for citrus trees could be held liable, because his expertise and knowledge made his statements facts rather than opinions. Where the parties have unequal knowledge and a special relationship, the court explained, statements of value can be actionable facts. *Id.* at 276. *Gould*

-10-

concerned fraudulent rather than negligent misrepresentation, but we see no reason that Wyoming would adopt a different distinction between facts and opinions in the two torts.

We believe that some of the statements made by Healthcare Realty in connection with its analysis of the financial viability of the new facility constitute actionable facts and so fall under the tort of misrepresentation as interpreted by the Wyoming courts. As in *Gould*, the parties to this case had a special relationship—here, as client and paid consultant—and Healthcare Realty, as an expert in the field, was hired precisely because of its superior knowledge of the field. When a paid consultant, relied on for its expertise, fails to exercise reasonable care or competence in obtaining or communicating information supplied for the guidance of others in their business transactions, the consultant is subject to liability for pecuniary loss caused to the clients by their justifiable reliance upon any false information supplied.

In light of the Wyoming Supreme Court's holding in *Birt*, we emphasize that the tort of negligent misrepresentation extends only to the misrepresentation of underlying facts; it does not extend to promises or predictions. Wyoming tort law does not make a consultant its clients' insurer against unanticipated developments, even if a more skilled prognosticator would have done a better job at anticipating the future. Therefore, Healthcare Realty is not liable merely because the predictions it made did not come true. Its statements must be judged

strictly according to information available at the time they were made, and not with the benefit of 20-20 hindsight. Nonetheless, the data from which predictions are derived may be factual in nature, and an expert has a duty of care in selecting the facts on which its analysis is based.

Memorial Hospital has identified at least four false statements of fact that, it says, underlay Healthcare Realty's financial projections. Based on our review of the record, the Hospital has demonstrated a genuine material dispute as to three of those misstatements. We discuss each in turn.

**1. Budget Line Item 3420:**

As part of its analysis of the financial viability of the project, Healthcare Realty prepared a detailed budget it called the Consolidating Development Budget, including the project's estimated expenses for "Accounting," "Leasing," "Marketing," and many other professional costs. App. 122. For accounting, the budget estimated $12,953; for marketing, $10,000; for leasing, the chart simply says "-", a hyphen. *Id.* The chart treats the "-" as if it were arithmetically equivalent to zero. In fact, Healthcare Realty later revealed, the figure for leasing costs should have been $180,000. Thus, the subtotal and total costs contained false information, because they relied on treating the applicable leasing costs as if they were zero, rather than a substantially higher number. If the Hospital justifiably relied on this information and Healthcare Realty failed to exercise

-12-

"reasonable care or competence" in providing it, Healthcare Realty is liable. *Richey*, 904 P.2d at 802.

The district court dismissed this claim because it thought substituting "-" for $180,000 was only nondisclosure, not misrepresentation. The court explained that it "lack[ed] the wizardly power [to] . . . turn nothing into something for purposes of summary judgment." App. 736. However, in the charts presented, Healthcare Realty treated the hyphen as if it meant not "nothing," but zero. Zero is a number, not the absence of one. *See generally* Robert Kaplan, *The Nothing That Is: A Natural History of Zero* 90–115 (1999). The usage in the budget is slightly confusing because, in the other budget attached to the POA, Healthcare Realty did use the numeral "0.00" instead of a hyphen. App. 116. But in the budget charts where hyphens appear, they are added as if they were zeroes. Thus, a reasonable jury could find that the projected leasing cost of zero given on line 3420 was false information supplied to the Hospital.

A jury could also infer that listing the cost for leasing as zero, rather than using whatever underlying data were available, was negligent. When revising the budget in March, 2000, Healthcare Realty substituted a projected expenditure of $180,000, explaining that it had originally expected "that the project management and contingency dollars would cover" the cost of leasing and that subsequent events had made this impossible. *Id.* at 696. This suggests that Healthcare Realty was aware that leasing costs would be above zero, but instead of revealing this

fact in the budget, buried the number in other line items. We cannot say, on this record, whether that treatment was reasonable. If subsequent events were responsible for making the "zero" estimate unrealistic, Healthcare Realty could not be held liable for misrepresentation. Without more information regarding these calculations, however, a jury might conclude that Healthcare Realty's representation that leasing would cost no money was a misstatement that the consultant knew at the time to be false. But that is a material issue of fact. The misrepresentation claim therefore survives summary judgment.

### 2. Tenant Allowance:

The budget also contained an entry of several million dollars for a "Tenant Allowance." App. 123. This allowance was money given to the tenants to outfit their suites for medical use. The budget entry was based on an estimate of $44 per usable square foot. Memorial Hospital has presented several emails that suggest that Healthcare Realty knew—before the contract was signed—that a typical suite would in fact require "between $50 and $60 per square foot." App. 705. It has also presented evidence that some potential tenants found the $44 allowance "not adequate to do a medical suite." App. 140. Memorial Hospital claims that keeping the $44 figure in the budget rather than a higher figure, and failing to make clear that the allowance would not actually cover all of the improvements that tenants would demand, was negligent misrepresentation.

The district court dismissed this claim as a matter of law, holding that because the Tenant Allowance was an "estimate[]," it should be characterized as an opinion under Wyoming law. App. 737. Other items on the budget have the notation "Est.," signifying that they were estimated. App. 122–23. The tenant allowance, however, noted just that it was "[b]ased on $44.00 USF." App. 122. If Healthcare Realty meant that $44 per square foot was enough to outfit the medical suites, that is a fact that it was required to derive non-negligently.

In a March 2000 letter to the Hospital, Healthcare Realty explained that it was forced to give the tenants significantly more than $44—as much as $60 per square foot—because the tenants expected the allowance to cover "virtually all costs of their suite construction." App. 442. However, the Hospital claims that it and the tenants were originally told that the $44 would be "an adequate amount for a reasonable tenant finish." Aplt's Br. 15. One letter in the record by a tenant also suggests that he was "led to believe that no additional funds would be necessary." App. 140. A reasonable jury could infer from this evidence that Healthcare Realty knew at the time that the $44 per square foot allowance was insufficient to cover what had been promised to the tenants.

We do not agree with the district court that projections of this sort, when made by expert consultants, are mere opinions that cannot be deemed misrepresentations of fact. As in *Gould*, where an expert's valuation of land was actionable, 299 P. at 276, we believe that the amount of money reasonably

-15-

necessary for a medical tenant to outfit an office is a matter of fact.[2]  Indeed, a

consultant's expertise in such matters is precisely what the client is paying for.

We do not mean to suggest—and Wyoming law would not support—that a

projection of this sort could be held to be a misrepresentation merely because it

turned out to be incorrect.  But there is evidence here that Healthcare Realty knew

at the time that $44 was inadequate to prepare a medical suite.  The Hospital

should be allowed to prove that this figure was false and that Healthcare Realty

failed to exercise reasonable care or competence in including this figure in their

estimate and in representing what it would purchase, based on the information

available to it when it prepared the budget.


### 3. Year 6 APOV Predictions:

In its Assessment of Building Vacancy, Healthcare Realty provided figures

for the "Net Rental Income" in the first five years of the project as a function of

the amount of the building rented.  App. 510.  In the two lines representing 94.5%

and 95.6% occupancy, the ABV assumes that net rental income would increase

about 2.5% annually for the first five years.  Mysteriously, the Year 6 calculation

---

[2]In *Gould*, the Wyoming Supreme Court said that it was "'for the jury to say'" whether a representation was fact or opinion.  *Id.* at 167 (quoting 12 Ruling Case Law § 42, at 278 (William M. McKinney & Burdett A. Rich eds. 1916)). Since then, it has held that this determination is a question of law.  *Birt*, 75 P.3d at 658.

in the APOA assumed an increase of approximately 7.9% over the net rental income reported for Year 5 in the ABV. Neither document explicitly notes this underlying change; the assumption is buried in the arithmetic. This assumption of a sudden increase in income allowed Healthcare Realty to estimate a surplus, rather than a deficit, for the project in Year 6. If Healthcare Realty had continued to apply the 2.5% increase for the sixth year, it would have predicted a shortfall of more than $70,000. The Hospital claims that Healthcare Realty's unexplained prediction of a bubble was without foundation and therefore negligent, or even fraudulent.

The district court dismissed this claim on the ground that the two charts were "projections and calculated opinions, rather than statements of existing or cognizable fact." App. 737. However, as discussed above, under Wyoming law, when an expert projects figures based on underlying data, he must use reasonable care and competence in selecting the data.

Memorial Hospital claims that in fact, Healthcare Realty's estimates of the rental rates were "tied to the [Consumer Price Index]" Aplt's Br. at 12, which would make the 7.9% estimated increase false. Indeed, in a later memorandum concerning the 10-year lease of one of the building's tenants, Healthcare Realty explicitly predicted the revenue from that lease to "increase at CPI annually." App. 648. A reasonable jury could infer from this record that Healthcare Realty

estimated the Year 6 increase in the building's revenue at one amount while reporting it as another, and thus conveyed false information.

At oral argument, Healthcare Realty said that it typically expects a jump in rate increases sometime between the fifth and eighth year because the first leases in a new building must be low in order to attract tenants, and those leases are five to eight years long. If this claim makes its way into the record and proves to be true, it might rebut the Hospital's allegation that the 7.9% increase was a negligent misrepresentation. But that is an issue to be established at trial. On this record, a reasonable jury could infer that the 7.9% increase was false and chosen without reasonable care, so material issues of fact on this point preclude summary judgment.

### 4. Operating Cost Budget:

The operating budget estimated operating costs at $5.25 per rentable square foot. They turned out to be, as Healthcare Realty admitted, $7.18 per rentable square foot instead. Memorial Hospital claims that the $5.25 figure was a misrepresentation. However, it points to nothing in the record that demonstrates that this projection was predicated on any factual data that were false, or negligently calculated, at the time. The figure was in the Hospital's original complaint, but no discussion of this point appears in its brief in response to the

-18-

motion for summary judgment. The district court did not discuss this issue in dismissing the Hospital's claim.

The Hospital's only evidence that the $5.25 figure was a misrepresentation is that years later the actual figure turned out to be higher. The tort of negligent misrepresentation does not, however, create a duty to be clairvoyant. Unlike the representations discussed above, there is nothing other than hindsight to show that Healthcare Realty violated a duty of care here. The Hospital fails to point to any evidence supporting its claim that Healthcare Realty was negligent, so there is no genuine issue of material fact on this point.

### 5. Other Aspects of the Misrepresentation Claim

In two footnotes, the district court held that even if the Hospital could establish that Healthcare Realty had conveyed false factual information, its misrepresentation claim would also fail as a matter of law because the Hospital could not prove it had reasonably relied on the figures or that Healthcare Realty had been negligent. We reverse these alternative holdings.

The district court held that the claim that Healthcare Realty had been negligent failed as a matter of law because the Hospital had only shown "one or two potentially unfounded estimates . . . amidst thousands of pages of projections." App. 739 n.15. It is true that, even on generous estimates, the

negligent misrepresentations identified by Memorial Hospital account for far less than half of the ultimate shortfall. A jury might find that the plaintiffs would have proceeded with the project even if these misstatements had not been made, in which case Healthcare Realty would not be liable. But we cannot say, on the summary judgment record, that the identified misstatements were so minor that they could not have affected Memorial Hospital's decisions on the margin; they were significant enough that, if corrected, they would have turned the projected sixth year profit into a loss. If the plaintiffs had received nonnegligent projections of the project's costs and revenues, they might have scaled back the building's size, made other economies, or even cancelled the project. Healthcare Realty can point to no undisputed facts in the record that would support a grant of summary judgment on the reliance issue.

The district court also held that the Hospital's reliance on the false information in the Assessment of the Property Operating Agreement could not have been reasonable in light of the Assessment of Building Vacancy—that is, that no reasonable person could have relied on the Year 6 bubble predicted in the former document. This conclusion is at odds with Healthcare Realty's litigating position, since it now defends its prediction of the Year 6 bubble. This conclusion is also an inappropriate matter for summary judgment because it fails to view the evidence in the light most favorable to the party opposing summary

-20-

judgment. On the record as it stands, a reasonable jury could decide that the Hospital's decision to trust Healthcare Realty's final prediction was reasonable.

The district court also held that the Hospital's reliance on the false figures was unreasonable because Healthcare Realty initially warned the Hospital that a 137,196-square-foot building was too large. However, the disputed projections that Healthcare Realty provided were specifically about a 137,196-square-foot building. The problem is that Healthcare Realty falsely made the project seem financially viable, despite its size. Healthcare Realty's earlier expression of disapproval of the project did not relieve it of a duty of care with respect to its final financial assessment of the project.

Finally, Healthcare Realty makes two related arguments that the contractual relationship created by the Operating Agreement precludes the Hospital's misrepresentation claim. First, Healthcare Realty argues that the economic loss doctrine bars the Hospital's tort claim. In negligent misrepresentation claims, that doctrine forbids a party from suing in tort for economic losses that arise only from a breach of contract. *Rissler & McMurry Co. v. Sheridan Area Water Supply Joint Powers Bd.*, 929 P.2d 1228, 1234–35 (Wyo. 1996). The purpose of this rule is to keep all contract claims from collapsing into tort claims. *Id.* Here, however, the Hospital's negligent misrepresentation claim does not arise from or rely on any provision of the contract at all, but is based on the information that

Healthcare Realty conveyed in its written assessments of the financial viability of the project. Wyoming law does not forbid tort claims between contracting parties if "tort liability [is] premised on a duty independent of contractual duties." *JBC of Wyoming Corp. v. Cheyenne*, 843 P.2d 1190, 1197 (1992).

Second, Healthcare Realty argues that Memorial Hospital's claim is barred by the Operating Agreement's merger clause, which states that the "Agreement embodies and constitutes the entire understanding between the parties with respect to the transactions contemplated herein, and all prior or contemporaneous agreements, understandings, representations and statements (oral or written) are merged into this Agreement." App. 107. The Wyoming Supreme Court has held that when a contract "clearly and unambiguously" waives all claims for negligent misrepresentation, the tort claim cannot be brought. *Snyder v. Lovercheck*, 992 P.2d 1079, 1089 (Wyo. 1999). In *Snyder*, the court held that a negligent misrepresentation claim was barred by a contract that contained not only a merger clause but also an express disclaimer of reliance on any warranties or representations. The court did not suggest that a merger clause alone would be enough to bar an independent tort claim for misrepresentation. *Id.* at 1088–89. Here, the district court concluded that the "vague and general integration/modification clause" did not waive the Hospital's misrepresentation claims, App. 733 n.9, and we agree.

-22-

**C. Misrepresentation in Contract**

The Hospital also brought a contract claim for misrepresentation in contract, requesting rescission of the Operating Agreement. Under Tennessee law, the decision to rescind the contract rests in the equitable discretion of the trial court. *True v. J.B. Deeds & Son*, 271 S.W. 41, 42 (Tenn. 1925); *Stonecipher v. Estate of Gray*, No. M1998-00980-COA-R3-CV, 2001 WL 468673, at *4 (Tenn. Ct. App. May 4, 2001).

Here, the district court found that it would be so difficult to return the parties to their original positions that equity ought not interfere. The court also found that there were no genuine issues of material fact that could support the Hospital's claim that there had been any misrepresentation in the first place. We have doubts about the latter conclusion, but nonetheless we affirm the court's decision not to rescind the contract. Under Tennessee law, proof of misrepresentation does not automatically entitle the plaintiff to rescission. *Stonecipher*, at *4. We have no reason to think that the district court's decision not to require rescission was an abuse of its equitable discretion.

**D. Good Faith and Fair Dealing in Contract**

The Hospital also sued Healthcare Realty for breach of its contractual duty of good faith and fair dealing based on conduct subsequent to the formation of the

contract. The Hospital alleges that, after the agreement was signed, Healthcare Realty concealed the building's unprofitability and its own errors in the original estimates by nondisclosure and by misleading responses to direct inquiries by the Hospital. The Hospital's evidence reveals a dispute sufficient to survive summary judgment.

Tennessee common law implies "in every contract a duty of good faith and fair dealing in its performance and enforcement." *Wallace v. Nat'l Bank of Commerce*, 938 S.W.2d 684, 686 (Tenn. 1996) (citing Restatement (Second) of Contracts § 205). Because this obligation is implied in the contract itself, it "does not extend beyond the agreed upon terms of the contract and the reasonable contractual expectations of the parties." *Id.* at 687. The duty of good faith is a specific obligation to live up to one's promises, not a general duty of care. However, to prove that a party has violated its duty of good faith, one need not necessarily show a specific breach of the contract. A party may not, in bad faith, stop the other party from "receiv[ing] the benefits of the agreement they entered into." *Goot v. Metro. Gov't of Nashville & Davidson County*, No. M2003-02013-COA-R3-CV, 2005 WL 3031638, at *7 (Tenn. Ct. App. Nov. 9, 2005).

The Hospital alleges that Healthcare Realty concealed and misrepresented financial information about the project after the agreement was signed, in violation of its duty of good faith. Its most important piece of evidence in

-24-

support of this claim is a 2002 exchange between the Hospital and Healthcare Realty. In February, the Hospital requested information from Healthcare Realty about its losses and why they were so much larger than originally estimated. As Memorial Hospital has now discovered, Healthcare Realty employee Doug Whitman drafted a memorandum that was later edited twice to portray a rosier financial picture.

The memorandum predicted a 3.5% annual rate increase in market rents. The original Assessment of Building Vacancy, as we have discussed, predicted a rent increase for the building of only 2.5% per year. In the first draft of the memo, Doug Whitman disclosed that he had intentionally "pushed" the figure up to 3.5% "to help boost revenues" in Healthcare Realty's estimates. App. 648. Any admission that the 3.5% growth figure had been optimistic, however, was removed from the second and third drafts of the memo. *Id.* at 653, 658. The subsequent drafts of the memo also increased the estimated "distributable cash flow" by over $30,000 in a section describing a mobilization allowance. *Id.* at 648, 658. No evidence in the record explains this change. Finally, in the original draft, Mr. Whitman wrote that "I wish the numbers were something different. It just makes me sick that the previous analysis was so off-base." *Id.* at 648. That comment was also eliminated from the final draft. All of these changes made the

assessment Healthcare Realty provided to Memorial Hospital rosier than Mr. Whitman's original memo suggests was realistic.

The Hospital offered further circumstantial evidence to suggest that Healthcare Realty concealed information. One July 2002 internal email from a Healthcare Realty analyst assessed changed economic conditions and concluded that the Hospital's shortfall would be $750,000 per year, even with the building 100% full. The email warned: "do not present this to anyone." *Id.* at 663. Healthcare Realty also did not share an October 2002 "pro forma" which concluded that, with 85% occupancy, Memorial Hospital would still owe Healthcare Realty between $590,000 and $817,000 every year at least until 2020 (when the chart stopped). *Id.* at 672. These figures were very different from those provided in the assessments provided before the contract was signed. The fact that Healthcare Realty did not disclose any of this information to the Hospital provides further evidence from which a jury could infer that Healthcare Realty was not executing its contractual duties in good faith.

The district court dismissed this claim as a matter of law because it concluded that the Hospital needed to show a breach of contract to succeed on its good faith claim, and it found no breach here. As the court put it, "[i]nstead of establishing a genuine issue that it was deprived of a benefit of the contract,

-26-

including all amendments thereto, [the Hospital] essentially argues that it should not be required to pay more than it expected for those benefits." *Id.* at 750.

We view both the duty of good faith and the contract slightly differently than the district court did. To establish a good faith claim, the Hospital needs to show that Healthcare Realty's conduct had "the effect of destroying or injuring the right of the [Hospital] to receive the fruits of the contract." *Winfree v. Educators Credit Union*, 900 S.W.2d 285, 289 (Tenn. Ct. App. 1995). If Healthcare Realty's bad faith forced the Hospital to pay substantially more under the Agreement than it otherwise would have been required to, then a jury could find that the Hospital's right to enjoy the fruits of the contract had been harmed. Here, if the Hospital had known what Healthcare Realty concealed, it might not have amended the Property Operating Agreement, might have brought this suit earlier, or might otherwise have mitigated its losses from the deal. Moreover, the Hospital might have made substantially different leasing and management decisions with the authority given to it by the POA.

Furthermore, the Operating Agreement contains terms that directly govern Healthcare Realty's obligations to truthfully disclose information to the Hospital. The Agreement obligates Healthcare Realty "to establish a relationship with respect to the Property that is geared toward the success of [the Hospital] and the contribution of the Property to that success," App. 94, as well as to "facilitate the

coordination of the operations of the Property with the operations of the Medical Facility, which coordination is intended to further the best interests of [Healthcare Realty and Memorial Hospital]," App. 93.  Most significantly, Healthcare Realty promised to provide "such . . . information as may be reasonably requested by [Memorial Hospital] from time to time with respect to the financial . . . condition of the property."  *Id.*  These two obligations—to manage the operation of the building in the joint best interests of the parties, and to provide information when reasonably requested—create some obligation of honest disclosure.  Intentionally overstating financial returns and concealing from a party its potential indebtedness are not consistent with this obligation.  From the edited emails and other nondisclosures, we think that a reasonable jury could conclude that Healthcare Realty did not perform its part of the contract in good faith.

Healthcare Realty argues that the Hospital is estopped from asserting any breach-of-contract claim by an amendment both parties later signed to the Operating Agreement.  That amendment said that "[e]ach party represents that the other is not in default under the terms of the POA, and no event has occurred or situation exists which would, with the passage of time or the giving of notice, constitute a default on the part of either party under the POA."  App. 194.  The amendment does not block the Hospital's claims.  The fairer construction of the amendment is that each party warrants that they do not *know* of any breach

-28-

committed by either party. It seems highly unlikely that the amendment was intended to ratify any secret breaches that either party had so far kept secret from the other. Because the Hospital did not discover that it was being given sanitized information until later, the amendment did not waive its right to sue for conduct of which was not yet aware. Furthermore, alleging a violation of the contractual duty of good faith does not require the Hospital to prove that Healthcare Realty was in technical breach. If Healthcare Realty was—in bad faith—obstructing the Hospital from receiving the "benefits of the agreement," *i.e.*, the information it reasonably requested, then it is liable. *See Goot*, 2005 WL 3031638, at *7.

**E. Good Faith and Fair Dealing in Tort**.

While the contract itself is governed by Tennessee law, Wyoming also recognizes a tort action for breach of contractual good faith. So far Wyoming has found this duty as a *tort* only "in rare and exceptional circumstances, such as first-party insurance contracts and long-term employment contracts." *Roussalis v. Wyo. Med. Ctr., Inc.*, 4 P.3d 209, 256 (Wyo. 2000). However, the Wyoming Supreme Court has not said that insurance and employment are the outer limits of the tort. Instead, the tort could exist in other "special relationship[s] of trust and reliance." *Wilder v. Cody Country Chamber of Commerce*. 868 P.2d 211, 221 (Wyo. 1994). "Th[e] driving rationale" for tort liability is a long term contract

that has "inequality of bargaining power." *Roussalis*, 4 P.3d at 256. *See also State Farm Mut. Auto. Ins. Co. v. Shrader*, 882 P.2d 813, 825 (Wyo. 1994) ("A recovery in tort for breach of the duty of good faith and fair dealing is premised upon the existence of a special relationship created by the unequal bargaining power that an insurer has over an insured.").

Whether the Hospital's and Healthcare Realty's relationship is the kind of special relationship envisioned by the Wyoming tort is a close question. The Hospital relied on Healthcare Realty for advice about what management scheme would be most financially viable, and their contract explicitly recognized the long-term relationship and mutual obligations of the parties. Furthermore, their relationship was one of unequal information because of Healthcare Realty's joint role as consultant and business partner. Unequal information generally amounts to unequal bargaining power. *See generally* Roger B. Myerson, *Two-Person Bargaining Problems with Incomplete Information*, 52 Econometrica 461 (1984). However, the Operating Agreement explicitly disavows a number of relationships between the parties that might approximate the ones deemed special under Wyoming law—employer-employee, principal-agent, etc. Further, the Hospital is not an economically unsophisticated party. The employment and insurance contexts suggest that the tort should be limited to long-term relationships of greatly unequal resources or unequal legal sophistication. Given the Wyoming

Supreme Court's elaboration of the tort so far, we will not extend the tort to a case of mere unequal information between the parties.

### F.  Mutual Mistake

Before the district court, the Hospital also argued that the contract should be rescinded on the basis of mutual mistake.  Tennessee law places that decision in the discretion of the trial judge, *Vakil v. Idnani*, 748 S.W.2d 196, 199 (Tenn. Ct. App. 1987), and the judge declined to rescind the contract.  The Hospital did not argue the point in its brief, so we will treat any objection as waived.

### III.  CONCLUSION

We **AFFIRM** the district court's grant of summary judgment on the Hospital's contract claims for misrepresentation and mutual mistake, and its tort claim for good faith and fair dealing.  We **REVERSE** the district court's grant of summary judgment on the Hospital's tort claim for misrepresentation, and its contract claim for good faith and fair dealing and **REMAND** those claims for further proceedings.

-31-